737 S.E.2d 640

QUICKEN LOANS, INC., Petitioner

v.

Lourie and Monique BROWN,
Respondents.

No. 11–0910.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 19, 2012.

Decided Nov. 21, 2012.

312

Thomas R. Goodwin, Johnny M. Knisely, II, Goodwin & Goodwin, Charleston, WV, for Petitioner.

James G. Bordas, Jr., Jason E. Causey, Christopher J. Regan, Bordas & Bordas, Wheeling, WV, for the Respondents.

Martin P. Sheehan, Sheehan & Nugent, P.L.L.C., Wheeling, WV, for Amicus Curiae Jay D. Hixson.

John W. Barrett, Jonathan R. Marshall, Bailey & Glasser, Charleston, WV, for Amicus Curiae National Association of Consumer Advocates.

Daniel F. Hedges, Bren J. Pomponio, Mountain State Justice, Inc., Charleston, WV, for Amicus Curiae Mountain State Justice, Inc.

Frances A. Hughes, Chief Deputy Attorney General, Jill L. Miles, Deputy Attorney General, Charleston, WV, for Amicus Curiae State of West Virginia ex rel. Darrell V. McGraw, Jr.

Anthony J. Majestro, Powell & Majestro, PLLC, Charleston, WV, for Amicus Curiae West Virginia Association for Justice.

McHUGH, J.:

Quicken Loans, Inc. ("Quicken"), a Michigan corporation and a large national mort-

gage lender doing business in West Virginia, appeals the May 2, 2011, order of the Circuit Court of Ohio County, West Virginia, denying post-trial motions for amendment of the circuit court's findings of fact and/or conclusions of law and for offset following a verdict which found it liable for common law fraud and various claims under the West Virginia Consumer Credit and Protection Act, as set forth in Chapter 46A of the West Virginia Code, in connection with a subprime loan made to Plaintiff Lourie Brown.

Upon careful review of the briefs and arguments of the parties,[1] the record appendix and the applicable legal authority, and for the reasons set forth below, the order of the circuit court is affirmed, in part; reversed, in part; and this matter is remanded for further proceedings.

## I. Factual and Procedural Background

Plaintiff and her mother purchased the subject property, a duplex, in 1988, where they or a member of their family have resided ever since.[2] The subject property is located in East Wheeling, West Virginia, and was purchased for $35,000.00.[3]

Upon the death of her mother in 2002, Plaintiff became solely responsible for paying all of the property's utilities, maintenance, taxes and insurance premiums thereon. When these financial obligations, among others, became difficult to meet, Plaintiff refinanced the subject property in August 2003, for $40,518; in January 2004, for $63,961; and in May 2005, for $67,348. She also took out four separate loans for $1,500, $3,060, $5,000 and $7,650, respectively, with interest rates ranging from 24.99% to 31.00%.[4]

In May of 2006, in an effort to consolidate her debt and lower her monthly payments, Plaintiff completed a basic on-line loan application after receiving a "pop-up" advertisement on her computer.[5] Thereafter, she began receiving telephone calls from various lending companies, including Quicken. Of the companies who contacted her, Plaintiff selected Quicken because she felt most comfortable dealing with mortgage banker Heidi Johnson, who "seemed very willing to help."[6]

---

**1.** We acknowledge with gratitude the amici briefs of Jay D. Hixson and Martin P. Sheehan, as bankruptcy trustees; and National Association of Consumer Advocates; Mountain State Justice; West Virginia Attorney General; and West Virginia Association for Justice.

**2.** Plaintiff's mother died in 2002. When the events herein transpired, Plaintiff was forty-one years old and a single mother to three children. She no longer lives on the subject property but has since married and moved with her youngest child to Pittsburgh. Plaintiff testified that she returns to the subject property most weekends to check on her oldest child, Monique Brown, who resides there, and who, as a result of a 2001 automobile accident from which she suffered a traumatic brain injury, has short term memory loss and other permanent injuries.

**3.** In 1993, Monique paid off the subject property with settlement monies she received from a wrongful death lawsuit following the death of her father and the subject property was transferred to her. According to the parties, at some point during the loan process in the present case, Monique executed a power of attorney appointing Plaintiff with the authority to pledge the subject property and use the loan proceeds in her discretion. The parties represent that Monique is a named party herein only because she is owner of the subject property.

**4.** The refinancing and loans as above-described were with CitiFinancial. Additionally, in November 2003, Plaintiff borrowed $5,785 from AmeriFirst Loan, and in February 2006, Plaintiff took out a Refund Anticipation Loan ("RAL") with Jackson Hewitt for $3,418, with an interest rate of 94.862%.

**5.** As explained by Plaintiff, she "saw an ad for loans, and, like it would list an amount, like if you wanted $100,000, it might be $500 and some dollars a month, or $140,000 might be 6– to $700 a month. I thought, well, if I could consolidate everything and have a cheaper payment, that would be better for me. So that's what got me interested in that in the first place."

**6.** Ms. Johnson's "willingness to help" is apparently derived from Quicken's written training materials. For example, Quicken provided "Selling Tips" to its employees to use when speaking with prospective borrowers on the telephone:

Your credit came back and I've had a chance to review it. Unfortunately, because of your credit score and the trend of how your bills have been paid you don't qualify for conventional mortgage programs. However, the good news is that we specialize in situations like yours and we have a program that can offer you financial relief and can help get you back on track. What we'll do now is review your current credit situation, discuss the program for, its benefits, and then accept your $500 good faith deposit to get the loan into process.

On or about May 23, 2006, Quicken requested that Title Source, Inc. ("TSI") arrange for an appraisal of the subject property. TSI, an appraisal management company, is a "sister company" to Quicken as they are owned by the same parent company, Rock Holdings.[7]

Pursuant to its routine practice, TSI put out an automated (electronic) appraisal request order, which was shared on the internet with independent-contractor appraisers. For reasons not entirely clear from the record, TSI's appraisal request order included an estimated value for the subject property of $262,500.[8] The appraisal request order was accepted by Appraisals Unlimited, Inc. and its appraiser, Dewey Guida.[9]

Based upon his appraisal of the subject property, Mr. Guida valued it at $181,700.

> The bottom line is this program is perfect for you and really is Step 1 in our 2 step process toward getting you back on track. Actually most people refer to this as a Stepping Stone Loan. Once you have established a consistent track record of timely payments, we can revisit your situation and hopefully refinance you to an even better program in the near future. First things first. Let's get this into the system and see if we can get your approval. To begin your loan, for your deposit did you want to use a Visa or Check by phone?

Additional training material included how to overcome a prospective borrower's objections to a loan. For example, when a client indicated that he or she "wants to wait," Quicken trained its employees to explain to him or her that

> Some clients in your situation are reluctant to just make a decision. Because of their credit situation they feel paralyzed, fearing they will do the wrong thing (again). This loan is the right decision because it will get you back on track to a strong credit standing and provide you with the benefit(s) of _____. I just don't want you to be one of the people who hold off thinking things will get better by themselves, and actually have things get worse. At that point there is no loan that you could qualify for.
>
> Let's make a good decision here. I want to put your loan into the system and obtain the approval that will be your first step in turning this ship around. Now, to being, for your deposit did you want to use a Visa or a MC?

7. TSI also provides for appraisals and other "vendor items" to lenders other than Quicken.

8. On appeal, Plaintiff suggests that the purpose of including the estimated value on the subject property is to improperly suggest a target value to the appraiser.

Quicken reviewed Mr. Guida's appraisal and approved it on May 31, 2006. The trial court concluded that not only was Mr. Guida's appraisal grossly inflated because the true fair market value of the subject property was actually $46,000, but also that Quicken's appraisal review was negligently conducted because it "ignored obvious flaws" in Mr. Guida's appraisal and "violated its own appraisal review standards and the Uniform Standards of Professional Appraisal Practice."[10]

Prior to approving Mr. Guida's appraisal, Quicken presented Plaintiff with a loan for $112,850, with monthly payments that were higher than what she had expected based upon the initial "pop up" advertisement. For this reason, Plaintiff became hesitant to proceed with the loan process. As a result, Plaintiff did not return telephone calls from

9. Although Quicken avers that with the automated appraisal request system, it "has no input whatsoever in regard to the selection of the appraiser or who the apprais[al] will be assigned to[,]" the record reveals that Mr. Guida conducted over 100 appraisals for loans made by Quicken.

10. The circuit court found, for example, that "the pictures comparing the 'comparable properties' to the subject property.... appeared to be architecturally more sophisticated, in better condition and had more expensive landscaping, all of which indicated that the comparables were in a very different neighborhood." Furthermore, Mr. Guida noted the subject property's neighborhood to be downtown, but the comparables were not selected from the downtown area. The court further found that Mr. Guida noted the neighborhood price range to be $30,000 to $200,000, "with a predominant value of $65,000. Then he proceeded to appraise the Property for $181,700 with no explanation of the reasoning why the subject Property is so drastically different from the predominant home in the area. This is a violation of USPAP/industry standards and was factually inaccurate as homes do not sell for $200,000 in East Wheeling[,]" where the subject property is located.

Other flaws in the appraisal which should have raised "red flags" to Quicken's appraisal review team were the fact that the condition and age of the home listed in the appraisal were false and that Mr. Guida identified the subject property as a single unit dwelling rather than a duplex. The foregoing are just some of the flaws and standards the circuit court found that Quicken's appraisal team should have seen and should have requested an explanation from Mr. Guida.

Ms. Johnson and other Quicken employees about the loan. According to Quicken's own records, on May 30, 2006, Plaintiff

> called me back and LVM [left voice message] that she no longer wants to go through with the loan. I forwarded the VM to the MB [mortgage banker Heidi Johnson] and asked her to call me back and let me know how she would like us to proceed.[11]

(Footnote added).

Even though Plaintiff had already told Quicken she did not wish to proceed with the loan, Quicken did not give up efforts to persuade her otherwise. According to Ms. Johnson's own written notation, on June 1, 2006, the day after Quicken approved Mr. Guida's $181,700 appraisal of the property, she attempted to contact Plaintiff:

> left message w/client that appraisal came in where we need and that we are ready to move forward/asked client to call back and speak w/me cause she wanted to back out/we have appraisal done now though so maybe I can save?

Quicken's records further indicate that Ms. Johnson tried to contact Plaintiff again on June 2 and June 5, 2006; following the latter attempt, Ms. Johnson noted the following: "have called and left numerous messages/client is not responding to me/if I don't hear back by Tues. I will have to kill it and we just charge her for the appraisal."

Ultimately, Plaintiff agreed to the loan on June 6, 2006, as indicated in the following notation by Ms. Johnson: "Client finally reached me/she was being swayed by a broker and that's why she wanted to back out/

client very timid[12] and I just had to spend a lot of time explaining to her being taken advantage of/Adding more cash out and taking up to full 80% LTV [loan to value] and will have closure today."[13] (Footnotes added).

For her part, Plaintiff testified that when she conveyed her hesitation to consummate the loan to Ms. Johnson,

> She told me that what they could do would be to refinance the loan in three to four months, and then that I could get it at a cheaper rate, but initially my credit scores weren't high enough; and that, once that loan was in place and I got—everything started to be paid off, then I would be able to refinance my loan."

(A925) Indeed, Plaintiff testified that she believed and trusted Ms. Johnson and that the promise to refinance "was one of the main factors in my decision to do it. . . . because I knew I couldn't keep up that type of payment for a long period of time, especially with a decreased income."[14]

As indicated above, the loan originally presented to Plaintiff, and for which she received a written "Good Faith Estimate," was in the amount of $112,850. The loan was an interest-only loan for the first three years and also provided for Plaintiff to purchase 2.5 "loan discount points"[15] resulting in a variable interest rate of 8.5% and an initial payment of $799 per month. This loan had no balloon payment feature.

In contrast, the loan at issue herein was for the much larger amount of $144,800, and was otherwise quite different from the origi-

---

**11.** This notation was written by Quicken employee Nivin Fathella.

**12.** In a subsequent email to a co-worker, Ms. Johnson indicated that she has been "handling [Plaintiff] with kid gloves because she is very fragile[.]"

**13.** As previously indicated, Ms. Johnson offered Plaintiff the loan amount of $144,800 after the appraisal of $181,700 conducted by Mr. Guida was approved by Quicken. The evidence at trial revealed that Quicken pays commissions to its employees based upon the amount of the loan, the number of loans closed per month and the type of loan. In Plaintiff's case, she received a subprime loan, which pays a higher commission

than do prime loans. Commissions to Quicken employees are paid monthly. Ms. Johnson's commission in the case of Plaintiff's loan was $834.40.

**14.** Plaintiff testified that the decrease in income refers to the fact that child support payments Plaintiff had been receiving at that time were about to come to an end apparently when her son turned eighteen years old.

**15.** As explained by Plaintiff's expert Margot Saunders, "loan discount points" are additional amounts of money paid up front by borrowers to buy down the interest rate of a loan which, in turn, lowers the monthly loan payment.

nal loan described above. Under the terms of this loan, the annual interest rate was 9.25% for the first three years and then adjusted every six months thereafter, to a maximum rate of 16.25% and a minimum of 7.75%. Thus, Plaintiff's monthly payment for the first three years was $1,144, excluding taxes and insurance.[16] This was a monthly savings to Plaintiff (for the first three years) in the amount of $316.[17] This loan product was unique because it was a thirty-year loan that was amortized over forty years, resulting in a $107,015.71 balloon payment at the end of the loan period. It is undisputed that Quicken did not provide Plaintiff with a written "Good Faith Estimate" for this loan after the loan was so drastically revised[18] to include, among other things, the balloon payment that was almost twice as large as the actual fair market value of the subject property.[19]

One or two days before the loan was scheduled to close, a packet consisting of eighty-one pages of closing documents was delivered to Plaintiff at her home. According to Plaintiff, she did not open the packet prior to the closing. The closing occurred at Plaintiff's home (the subject property) on July 7, 2006, and was attended only by Plaintiff and a notary public unaffiliated with Quicken. According to Plaintiff, when the notary arrived, he opened the packet and told her to sign the documents having red "sign here" stickers already on them. Plaintiff testified that the notary "basically was waiting for me to sign them, and then he would stamp some of them[;]" that she attempted to ask him questions about what

some of the documents meant, but that he said she would have to speak with someone at Quicken because he did not know the answers; and that the process was all "kind of hurried and rushed when we went through the paperwork." Indeed, the loan closing took approximately fifteen minutes to complete. Plaintiff admitted that she did not closely review the closing documents in any detail.

As discussed in more detail below, from this Court's review of the record, it appears that the closing documents disclosed that there was "a large balloon payment." However, the actual and precise amount of the balloon payment was not otherwise disclosed therein. Plaintiff admitted that she saw the term "balloon payment" during the closing. She testified that

I believe I saw that on the paper. I wasn't exactly sure what it meant, though. It really—I don't know. I can't say it didn't concern me; it did. But the fact that we were going to be refinancing in three to four months was what I was mainly—."

Additionally, as set forth in the HUD Settlement Statement document also presented to Plaintiff for her signature at closing, Quicken ostensibly charged Plaintiff four "loan discount points" amounting to $5,792. However, at the time Plaintiff's loan was offered, the maximum number of loan discount points available on a loan with a 9.25% initial interest rate such as hers was 2.5 points. Thus, although Quicken represented to Plaintiff that she purchased four loan discount points,[20] she only actually purchased

---

**16.** Comparatively, Plaintiff's previous mortgage with CitiFinancial had a thirty-year fixed rate of 9.75% and a monthly payment of $578. Plaintiff's other debt, which was consolidated with the CitiFinancial mortgage under the Quicken loan, was unsecured.

**17.** However, according to Quicken's own financial expert, beginning two years and five months into the loan, Plaintiff no longer saved money as compared to her previous mortgage and other debt. Furthermore, after five years (or 60 payments), Plaintiff's monthly payment would be $1,582, as compared to the combined monthly payment for her previous mortgage and other debt, which would have been $578.

**18.** According to Ms. Saunders, the federal Real Estate Settlement Procedures Act (RESPA) requires that a good faith estimate be provided when there is a new loan product with different closing costs to be charged.

**19.** In the case of Plaintiff's loan, after making 360 loan payments ranging from $1,144 to $1,582 and totaling $550,084, Plaintiff, who, at all times relevant, earned $14.36 per hour as a licensed practical nurse, was required to make a single balloon payment of $107,015.71 to avoid foreclosure.

**20.** In a June 26, 2006, email from Ms. Johnson to a co-worker, she stated that Plaintiff "knows that she is buying the rate way down to keep her

2.5 points. (That is, $3,692 of the total $5,792 loan discount fee paid by Plaintiff actually resulted in a reduction in the interest rate.) Unbeknownst to Plaintiff, therefore, $2,100 (i.e., 1.5 points worth) of the $5,792 she believed she was paying Quicken to "buy down" her interest rate resulted in no such benefit to her.

Plaintiff presented evidence at trial that, under Quicken's own policies, Ms. Johnson had the discretion to charge the additional $2,100 fee, from which she received a share:

(i) General Rule—As a general rule, Mortgage Bankers are required to adhere to Quicken Loans published daily rates in quoting rates, points, fees and programs to prospective clients.

(ii) Premiums—Mortgage Bankers shall have the discretion to charge a rate/point/fee structure that exceeds the daily price sheet on certain products, provided that the price charged does not exceed the daily price sheet price by more than two points. The additional revenue resulting from the Mortgage Banker's proper exercise of such discretion is considered the 'premium' for purposes of Section I B above.

It is Plaintiff's contention that Ms. Johnson charged her such a "premium" in the amount of $2,100 but falsely represented to her that she was receiving a corresponding reduction in the interest rate on her loan.

Quicken argued, however, that regardless of how the fee was represented to Plaintiff on the closing documents, Quicken would still have charged Plaintiff the excess fee up front because Plaintiff had become delinquent on her existing mortgage with CitiFinancial and as a result, became a greater credit risk to Quicken. Quicken's explanation notwithstanding, the circuit court found that "[t]he manipulation of the increase of 1.5 percent 'discount points' misrepresented to [Plaintiff] that her interest rate would be reduced."

With the loan proceeds, Plaintiff paid off her previous mortgage and consolidated debt; received $40,768.78, with which she purchased a new vehicle (for $28,536.90) [21]; retired other existing debt; and made the first two payments on the loan.[22] After making timely September and October payments, Quicken's telephone calling records indicate that, beginning in early October 2006, Plaintiff made numerous attempts to contact Quicken. According to Plaintiff, the purpose of her repeated efforts was to begin the refinancing process, as promised by Ms. Johnson when Plaintiff agreed to the loan. Quicken refused to refinance the loan.[23]

Thereafter, in January 2007, Plaintiff was required to undergo surgery and, due to complications, underwent a subsequent emergency surgery. As a result, Plaintiff was unable to work for a time and ultimately, defaulted on the loan. Her repeated requests of Quicken, both by telephone and in writing, to work out a payment arrangement in light of her situation were refused.

According to Plaintiff, in August 2007, she provided statutory notice of a claim and afforded Quicken a right to cure under West Virginia Code § 46A–6–106(b) (2005) (Repl. Vol.2006). However, no cure offer was made and Quicken began foreclosure proceedings.

Plaintiff filed suit against Quicken, Appraisals Unlimited, Inc., appraiser Dewey Guida,[24] and John Doe Note Holder [25] in the

payment lower. She's very worried and I told her not to be we can still do this."

**21.** According to Plaintiff, the extra cash was initiated by Quicken. She testified that,

[w]ell, she [Ms. Johnson]—when she got the appraisal done, she said that it came in at $181,000, I believe. And she said that—she said: is there anything else that you're going to need because you have this money available to you?
And I kind of thought about it at the time because, once I did the loan, I wasn't really going to have any money available to do anything extra with. And I had an SUV at the time that really cost me a lot of money in gas, and I decided to get a car that was going to last me for a while.

**22.** Under the terms of the loan, the first payment was due September 1, 2006.

**23.** Quicken denied Plaintiff's request to refinance sometime in October 2006, before Plaintiff's November payment was due on November 1st. Plaintiff did not make the November payment until January 16, 2007.

**24.** The parties represent that Plaintiff settled with Mr. Guida and Appraisals Unlimited prior to trial for the amount of $700,000.

Circuit Court of Ohio County, alleging that she was the victim of a predatory lending scheme and consumer fraud relating to the loan at issue. Following a six-day bench trial, the circuit court entered an order on February 25, 2010, in which it found that Quicken committed fraud and violated various provisions of the West Virginia Consumer Credit and Protection Act, including West Virginia Code § 46A–2–121 (1996), regarding unconscionability; West Virginia Code § 46A–6–102(7)(K)(L)(M) and (N) (2005) and § 46A–6–104 (1974), regarding unfair and deceptive acts; and West Virginia Code § 46A–2–105 (1974), regarding illegal balloon notes. The circuit court further found that Quicken violated West Virginia Code § 31–17–8(m)(8) (2002) (Repl.Vol.2009), regarding illegal appraisals.[26] The relevant findings and conclusions of the circuit court will be more fully discussed below in connection with Quicken's specific assignments of error.

The circuit court further concluded that the Note and Deed of Trust were unenforceable as a matter of law; awarded restitution of payments made by Plaintiff to Quicken in the amount of $17,476.72; ordered Quicken and its successors and assigns to take action consistent with the court's order to reflect the termination of the Deed of Trust; and enjoined them from attempting to collect any future payments under the loan. Notably, the circuit court did not order Plaintiff to repay the loan principal thereby effectively canceling Plaintiff's loan obligation.

A subsequent trial was conducted on September 1, 2010, on the issue of attorneys fees and punitive damages. Upon the conclusion thereof, the circuit court entered an order on February 17, 2011, in which it awarded Plaintiff attorneys fees and litigation costs in the total amount of $596,199.89, and punitive damages in the amount of $2,168,868.75.

Quicken's post-trial Motion for Amendment of Findings of Fact and/or Conclusions of Law and Motion for Offset of Judgment Pursuant to Settlement of Defendant Dewey V. Guida were summarily denied by the circuit court's order entered May 2, 2011. This appeal followed.

## II. Standard of Review

■ It is well settled that

[i]n reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 1, *Public Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996).

## III. Discussion

### A. Fraud

In its first assignment of error, Quicken asserts that the circuit court erred in finding that Plaintiff proved, by clear and convincing evidence, that Quicken fraudulently induced Plaintiff to enter into the loan. The circuit court concluded that Quicken committed fraud by not only failing to disclose the enormous balloon payment prior ·to the closing but also by failing to properly disclose it at the closing; by falsely promising Plaintiff that it would refinance her loan in three to four months after closing; and by misrepresenting to her the extent to which she was buying down the interest rate on the loan.

■ This Court has consistently described the elements of fraud as follows:

" '[t]he essential elements in an action for fraud are: "(1) that the act claimed to

---

**25.** Plaintiff alleged that "John Doe Note Holder is the current holder of [Plaintiff's] loan" who had not been identified when the complaint herein was filed. According to the evidence at trial, Quicken originates loans but does not service them. Rather, it sells "100%" of them to investment banks on Wall Street, which then securitize them into trusts and sell them to large corporate investors.

**26.** Plaintiff also filed a claim for breach of the covenant of good faith and fair dealing, which the trial court found "has not been applied to a lender/borrower relationship in West Virginia" and therefore was not addressed by the court.

be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it." *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737, (1927).' Syl. Pt. 1, *Lengyel v. Ling* [*Lint* ], 167 W.Va. 272, 280 S.E.2d 66 (1981)." Syllabus Point 5, *Kidd v. Mull,* 215 W.Va. 151, 595 S.E.2d 308 (2004).

Syl. Pt. 5, *Folio v. City of Clarksburg,* 221 W.Va. 397, 655 S.E.2d 143 (2007). Furthermore, allegations of fraud must be established by clear and convincing evidence. Syl. Pt. 5, *Tri–State Asphalt Products, Inc. v. McDonough Co.,* 182 W.Va. 757, 391 S.E.2d 907 (1990).

### 1. Balloon Payment

■ The evidence at trial revealed that the loan as originally presented to Plaintiff (for $112,850) did not include a balloon payment of any kind, as indicated in the written Good Faith Estimate provided to Plaintiff. In sharp contrast, the loan at issue included an enormous balloon payment. However, Quicken failed to provide Plaintiff with a written Good Faith Estimate for the revised loan, which would have set forth this very critical loan term for Plaintiff to consider.

Moreover, as the circuit court found, the $107,015.71 balloon payment was not conspicuously disclosed on the note as required by West Virginia law. This finding is undisputed by Quicken. West Virginia Code § 46A–2–105 very clearly requires that

"whenever any scheduled payment is at least twice as large as the smallest of all earlier scheduled payments other than any down payment any writing purporting to contain the agreement of the parties shall contain the following language typewritten or printed in a conspicuous manner. THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS: Followed, if there is only one installment which is at least twice as large as the smallest of all earlier scheduled payments other than any down payment, by: AN INSTALLMENT OF $ . . . WILL BE DUE ON . . . or, if there is more than one such installment, by: LARGER INSTALLMENTS WILL BE DUE AS FOLLOWS: (The amount of every such installment and its due date shall be inserted)."

*Id. See Mallory v. Mortgage America,* 67 F.Supp.2d 601, 608 (S.D.W.Va.1999) ("With respect to § 46A–2–105(2), the legislature used the word 'shall,' and there being no language within the statute indicating an intent to the contrary, the court construes the statute as mandatory . . . [and] strict compliance is required.").

It is Quicken's contention that, despite its failure to comply with the foregoing statutory requirement, the balloon payment was described "in detail" in the following closing documents delivered to Plaintiff prior to closing: the "3/6 Adjustable Rate/Balloon Mortgage Disclosure," the "Adjustable Rate Rider," and the "Adjustable Rate: Balloon Note."

This Court's review of the "3/6 Adjustable Rate/Balloon Mortgage Disclosure" reveals that the extent of the "Balloon Payment" section in that document is as follows:

BALLOON PAYMENT. With this loan program, you will make 360 monthly payments of principal and interest. The amount of those monthly payments will be based on a 40 year repayment schedule, your interest rate and the amount of your loan. Since this loan is based on a repayment schedule that is longer than your loan term, your last payment at the end of 30 years will be a large balloon payment. At least ninety days before the end of your loan, you will receive notice that your loan balance is due and when you must pay the balance in full.

The "Adjustable Rate Rider" and the "Adjustable Rate Balloon Note" documents are even less descriptive. Both of those documents include language that is very similar to that which was set forth in the "3/6 Adjustable Rate/Balloon Mortgage Disclosure" document, above, but *neither* describes the balloon payment due and payable as "large." Rather, the "Adjustable Rate Rider" and the "Adjustable Rate Balloon Note" documents provide only that "THERE WILL BE DUE AND PAYABLE ON THE MATURITY

DATE OF THIS NOTE A FINAL BALLOON PAYMENT OF THE THEN OUTSTANDING PRINCIPAL BALANCE PLUS ALL ACCRUED AND UNPAID INTEREST." To be clear, nowhere in the closing documents signed by Plaintiff at the July 7, 2006, closing does the balloon payment amount of $107,015.71 appear.[27]

Not surprisingly, the foregoing documents are, under any standard, very complicated and include sophisticated terms and concepts that require specialized knowledge. Despite the complex nature of the closing documents, Quicken did not send a representative to the closing who could answer Plaintiff's questions or point out to her that the loan has a balloon payment which amounted to $107,015.71. To the contrary, Quicken's position with regard to its failure to disclose the $107,015.71 balloon payment was summed up during oral argument before this Court when its counsel maintained that the amount of the balloon payment was a "math product," thereby suggesting Plaintiff should have simply calculated the amount of the balloon payment on her own.[28]

Quicken's arguments notwithstanding, the mandatory statutory requirement that the loan agreement "contain the language essentially as set out in the statute and in the conspicuous manner illustrated" therein serves the very reasonable and important purpose of advising borrowers in no uncertain terms that, at some point during the course of the loan, a balloon payment of a precise amount will be due and owing to the lender on an equally precise date. *Mallory*, 67 F.Supp.2d at 609. The Court in *Mallory* specified that West Virginia Code § 46A–2–105(2) "was designed to bring home to the borrower the extraordinary payment that must some day be met." 67 F.Supp.2d at 609.

In light of the foregoing, we now proceed to determine if the circuit court properly concluded that Quicken's above-described conduct with regard to its failure to properly disclose the enormous balloon payment due on the loan was an act of fraud. This Court has recognized that "[f]raudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead." *Trafalgar House Constr. v. ZMM, Inc.*, 211 W.Va. 578, 584, 567 S.E.2d 294, 300 (2002) (*citing Silva v. Stevens*, 156 Vt. 94, 589 A.2d 852, 857 (1991)). Thus, this Court has recognized that " ' "an action for fraud can arise by the concealment of truth." ' " *Smith v. First Community Bancshares, Inc.*, 212 W.Va. 809, 822, 575 S.E.2d 419, 432 (2002) (internal citations omitted). Indeed, " '[f]raud is the concealment of the truth just as much as it is the utterance of a falsehood.' *Frazer v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902)." *Id.*

It is undisputed that the reason Plaintiff sought to refinance was to consolidate her debt and reduce her monthly payments—in short, to save money. Concealing such an enormous balloon payment from Plaintiff was designed to mislead her and to induce her into entering into the loan and, in fact, that is precisely what occurred. With regard to Plaintiff's reliance on Quicken's concealment of the exorbitant balloon payment amount, " '[i]t is not necessary that the fraudulent [concealment] . . . should be the sole consideration or inducement moving the plaintiff. If the [concealment] contributed to the formation of the conclusion in the plaintiff's mind, that is enough[.]' " *Trafalgar House*, 211 W.Va. at 585, 567 S.E.2d at 301 (*quoting* syl. pt. 3, *Horton v. Tyree*, 104 W.Va. 238,

---

**27.** We note that the amount of the balloon payment and its due date were set forth on the Federal Truth in Lending Statement but, for reasons that are unclear from the record, it appears that Plaintiff was not presented with this document prior to or on the date of closing. Rather, she signed it at a later date. Quicken does not argue on appeal that this document disclosed to Plaintiff prior to or at the July 7, 2006, closing that the amount of the balloon payment was $107,015.71.

**28.** Indeed, calculating the amount of the monthly payments and the amount of the balloon payment would not have been an easy task for the average borrower. Although Plaintiff's initial monthly payment of $1,114 and initial interest rate of 9.25% appeared in the closing documents, the subsequent changes to the monthly payment involved a complicated calculation.

139 S.E. 737 (1927)). Accordingly, this Court finds that the circuit court properly concluded that Quicken committed fraud with regard to its failure to properly disclose to Plaintiff the amount of the balloon payment due on the loan and that Plaintiff proved this failure by clear and convincing evidence.

### 2. Promise to Refinance

As previously indicated, Plaintiff testified that upon seeing the term "balloon payment" in the loan documents, she became "concerned." She further testified that she did not know exactly what the term meant. Indeed, as already established, the amount of the balloon payment was fraudulently concealed. Plaintiff testified that she knew she would be unable to keep up with the monthly payments for a long period of time especially because the child support payments she was then receiving would soon be ending. According to Plaintiff, she went forward with the loan because Quicken promised that she could refinance in three to four months after closing. Though Quicken denies that it made such a promise to refinance, the evidence at trial revealed that precisely three months after the closing—after she had timely made her September and October mortgage payments—Plaintiff made repeated attempts to contact Quicken. Plaintiff's attempts to contact Quicken at that time are clearly consistent with Quicken's promise to refinance three to four months after closing. The circuit court concluded that her attempts to contact Quicken were for the purpose of beginning the refinancing process.[29]

Quicken's fraudulent misrepresentation to Plaintiff that it would refinance the loan in three to four months was clearly material because, absent that promise, Plaintiff would not have otherwise entered into the loan.[30] Given these facts, this Court finds that the circuit court properly concluded that Plaintiff proved by clear and convincing evidence that Quicken falsely promised Plaintiff that it would refinance her loan in three to four months after closing and that Plaintiff was justified in relying on that promise.

### 3. Loan Discount Points

It is undisputed that Quicken charged Plaintiff $5,792 for four loan discount points to buy down the interest rate on the loan. It is further undisputed that, in fact, Plaintiff purchased only 2.5 points because, at the time the loan was offered, 2.5 points were the maximum number of loan discount points available on a loan such as Plaintiff's. Thus, of the $5,792 Plaintiff paid Quicken to ostensibly buy down her interest rate, $2,100 of that amount (or 1.5 points worth) resulted in no such benefit to her. In reality, the facts established in the circuit court below indicated that Quicken charged Plaintiff a $2,100 "premium," which was an additional fee Quicken mortgage bankers were permitted, in their discretion, to charge clients.

29. Quicken concedes that, according to Quicken representative Anthony Nuckolls, a client could, in fact, refinance a loan after a four-month period if, among other things, the client had made timely payments on the loan. Quicken contends that *if* it promised to refinance Plaintiff's loan, Plaintiff breached the alleged bargain because she "did not make her loan payments for four months, as required under her own version of the supposed promise."

Quicken's argument in this regard misstates the evidence. Plaintiff's testimony was not that Quicken promised to refinance after Plaintiff made four timely payments on the loan. Rather, Plaintiff testified that Quicken promised to refinance "in three to four months," at which time Plaintiff "could get it at a cheaper rate" and "once that loan was in place and I got—everything started to be paid off, then I would be able to refinance my loan." Plaintiff closed on the loan on July 7, 2006, and three months later, after she timely made her September and October payments, she promptly began efforts to contact Quicken to begin the refinancing process.

30. Quicken briefly argues that even if it had promised to refinance, there is no evidence that the promise was false or made with fraudulent intent. Not unlike this Court's decision in *Traders Bank v. Dils*, 226 W.Va. 691, 704 S.E.2d 691 (2010), this case "involves the exception to the general rule that fraud cannot be predicated on a promise not performed. This exception ... comes into play where the device used to accomplish the fraud is the promise itself." *Id.*, 226 W.Va. at 695, 704 S.E.2d at 695. Indeed, "[t]he critical element of a fraudulent inducement claim is an oral promise that is used as an improper enticement to the consummation of another agreement." *Id.*, 226 W.Va. at 696, 704 S.E.2d at 696.

The circuit court concluded that "[t]he manipulation of the increase of 1.5 percent 'discount points' misrepresented to [Plaintiff] that her interest would be reduced." (FOF 43). On appeal, Quicken argues that even if a portion of the loan discount points should have been labeled differently, there was no evidence presented at trial which proved that if the loan discount had been accurately described on the closing documents, Plaintiff would not have consummated the loan. In other words, Quicken argues, there was no evidence that Quicken's misrepresentation as to the loan discount points being charged were either material or relied upon by Plaintiff such that the misrepresentation was an act of fraud.

This Court's review of the record indicates that Quicken misrepresented to Plaintiff the extent to which she was buying down her interest rate. It charged her $2,100 for a benefit she never received. Quicken's claim that it would have charged Plaintiff this extra fee anyway based upon the fact that she was a high credit risk in no way legitimizes its actions, which this Court finds to be distasteful and opportunistic. Nevertheless, an action in fraud requires that Plaintiff prove that she relied upon the misrepresented discount points when she entered into the loan. From our review of the evidence, we agree with Quicken that clear and convincing evidence in this regard was not presented.

Although we do not find that the elements of fraud were met with regard to the misrepresentation of the loan discount points, we otherwise affirm the circuit court's rulings that the evidence relating to the concealment of the balloon payment and promise to refinance were acts of fraud and were proven by clear and convincing evidence.

## B. Unconscionability under West Virginia Code § 46A–2–121

Quicken also asserts that the circuit court committed error in concluding that, under West Virginia Code § 46A–2–121, the loan to Plaintiff was induced by unconscionable conduct; included several unconscionable terms; and was, in and of itself, an unconscionable loan product.

This Court has recognized "unconscionability" to be a "general contract principle, based in equity." *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 234, 511 S.E.2d 854, 859 (1998), *overruled, in part, on other grounds, Dan Ryan Builders, Inc. v. Nelson*, 230 W.Va. 281, 737 S.E.2d 550 (2012).

As this Court held in syllabus point three of *Arnold*,

" 'The legislature in enacting the West Virginia Consumer Credit and Protection Act, W.Va.Code 46A–1–101 *et seq.*, in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act. To further this purpose the legislature, by the express language of W.Va.Code 46A–5–101(1), created a cause of action for consumers and imposed civil liability on creditors who include unconscionable terms that violate W.Va.Code, 46A–2–121 in consumer agreements.' Syl. pt. 2, *U.S. Life Credit Corp. v. Wilson*, 171 W.Va. 538, 301 S.E.2d 169 (1982)." Syl. pt. 1, *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 369 S.E.2d 882 (1988).

West Virginia Code § 46A–2–121 provides, in relevant part, that

(1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:

(a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or

(b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.

The Act does not define the term "unconscionable." However, in past cases, this Court has relied on the definition provided in the Uniform Consumer Credit Code ("Consumer Credit Code"), the unconscionability

provisions of which are identical to West Virginia Code § 46A–2–121(1)(a) and (b). *Arnold,* 204 W.Va. at 234, 511 S.E.2d at 860; *Herrod v. First Republic Mortgage Corp., Inc.,* 218 W.Va. 611, 617, 625 S.E.2d 373, 379 (2005); *Orlando v. Finance One of West Virginia, Inc.,* 179 W.Va. 447, 369 S.E.2d 882 (1988). As a result, we found the drafters' comments to the Consumer Credit Code to be highly instructive, recognizing that

> " 'the principle of unconscionability "is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position." See Uniform Consumer Credit Code, section 5.108 comment 3, 7A U.L.A. 170 (1974).' "

*Arnold,* 204 W.Va. at 235, 511 S.E.2d at 860 (internal citation omitted). *See Herrod,* 218 W.Va. at 617, 625 S.E.2d at 379.

According to the drafters of the Consumer Credit Code,

> "The basic test is whether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract."

*Arnold,* 204 W.Va. at 235, 511 S.E.2d at 860 (*quoting Orlando,* 179 W.Va. at 450, 369 S.E.2d at 885). *See Herrod,* 218 W.Va. at 617, 625 S.E.2d at 379.

Furthermore, the drafters explained that " '[t]he particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others.' " *Arnold,* 204 W.Va. at 235, 511 S.E.2d at 860 (*quoting Orlando,* 179 W.Va. at 450, 369 S.E.2d at 885). *See Herrod,* 218 W.Va. at 617, 625 S.E.2d at 379.

▮ Importantly,

> " '[a] bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even be-

cause the inequality results in allocation of risks to the weaker party. But gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion or may show that the weaker party had no meaningful, no real alternative, or did not in fact assent or appear to assent to the unfair terms.' "

*Arnold,* 204 W.Va. at 235, 511 S.E.2d at 860 (*quoting Troy Mining Corp. v. Itmann Coal Co.,* 176 W.Va., 599, 604, 346 S.E.2d 749, 753 (1986)).

▮ Accordingly, this Court held in syllabus point 4 of *Arnold,* that " '[a] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and "the existence of unfair terms in the contract." ' Syl. pt. 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co.,* 186 W.Va. 613, 413 S.E.2d 670 (1991)."

▮ As indicated above, the circuit court determined that the loan was induced by Quicken's unconscionable conduct, that the loan included several unconscionable terms, and that the loan product, in and of itself, was unconscionable.

With regard to unconscionability in the inducement, the circuit court in the present case concluded that the unconscionable conduct of Quicken included "[t]he false promise of refinancing; [i]ntroducing a balloon payment feature at closing; [f]ailing to properly disclose the balloon payment; [f]alsely representing that the plaintiffs were buying the interest rate down; and [n]egligently conducting the appraisal review and failing to realize the highly inflated appraisal from Guida[.]"

In arguing that the circuit court committed error in concluding that the loan was induced by its unconscionable conduct, Quicken reiterates its previous argument that the loan was not fraudulently induced. *See One Valley Bank of Oak Hill, Inc. v. Bolen,* 188 W.Va. 687, 691, 425 S.E.2d 829, 833 (1992) (stating that "W.Va.Code, 46A–2–121 [1974], expressly deals with conduct that is 'uncon-

scionable' which we have equated with fraudulent conduct." (Footnote omitted)). Having already determined that Quicken acted fraudulently in inducing Plaintiff into entering into the loan, we therefore conclude that there is no merit to Quicken's contention that it did not violate West Virginia Code § 46A–2–121 in this regard.

■ The circuit court further determined that the loan product, in and of itself, is unconscionable and that it "contains several unconscionable terms," including loan discount points of $5,792, without a fully corresponding reduction in the interest rate or any benefit to Plaintiff [31]; a $107,015.71 balloon payment that was not properly disclosed under West Virginia Code § 46A–2–105(2); and a loan which was based on an inflated appraisal of $181,700 "when the proper fair market value of the Property was $46,000." Finally, the circuit court found that Quicken converted Plaintiff's previously-unsecured debt of approximately $25,000 into secured debt and, upon consolidating the secured debt with her outstanding mortgage to CitiFinancial, "raised her secured monthly debt obligation from $578 to $1,114, thus, putting [Plaintiff's] home at risk. The net effect of this conversion is unconscionable." [32] (Footnote added).

It is Quicken's contention that a bargain is unconscionable only when it is so one-sided as to have an overly harsh effect on the disadvantaged party and lead to absurd results. Quicken challenges the circuit court's findings and conclusions arguing that the court failed to weigh the clear and immediate benefits of the loan to Plaintiff. Such benefits, according to Quicken, included a large cash payout with which Plaintiff purchased a new car and satisfied other debt, reduced monthly payments, and a reduced interest rate.

Plaintiff counters that the lower interest rate and lower monthly payment resulting from the loan were temporary because they were good only for three years and were far outweighed by the exorbitant cost of the loan. The loan converted Plaintiff's previous 9.75% fixed rate mortgage with CitiFinancial into a variable rate ranging from 7.75% to 16.25%. According to Plaintiff, who was earning $14.36 per hour at the time she applied for and received the loan, her mortgage payment would have equaled $1,582 per month (excluding taxes and insurance) at the highest rate.

Plaintiff argues that, as evidence of just how short-lived any savings to Plaintiff would be, Quicken's own financial expert testified that beginning only two years and five months into the loan, Plaintiff's monthly payments would no longer save her money as compared to Plaintiff's previous mortgage payment and other (unsecured) debt, which the Quicken loan consolidated. In fact, as previously noted, Quicken's expert testified that in year five of the loan, the monthly payment would be $1,582, whereas the combined monthly payment for Plaintiff's previous mortgage and other debt would have been $578. Plaintiff points out that, in total, the cost of the Quicken loan, when compared to Plaintiff's prior mortgage and prior debts, was an additional $349,000 in monthly payments.

Furthermore, Plaintiff argues that in consolidating her debt, Plaintiff's formerly unsecured debt was now secured under the Quicken loan. Plaintiff contends that, given her well-documented poor credit history, income and financial obligations, it was unconscionable for Quicken to secure all of her debt and to thereby jeopardize her family's home.[33]

As set forth above, in determining unconscionability, this Court "must focus on the

---

**31.** More specifically, as previously discussed, $2,100 of the $5,792 Quicken charged Plaintiff in loan discount points did not have a corresponding reduction in the interest rate.

**32.** Although the circuit court also concluded that the "excessive closing costs of $8,889" were unconscionable (which costs included fees to Quicken of $5,792 and $575), the court's order

does not discuss the loan's closing costs other than in the context of the loan discount points.

**33.** With regard to the cash she received under the loan, with which she purchased a new car, Plaintiff contends that the offer of cash was initiated by Quicken after it approved the grossly-inflated appraisal from Mr. Guida.

relative positions of the parties, the adequacy of the bargaining positions, the meaningful alternatives available to the Plaintiff, and the 'existence of unfair terms in the contract.' " *Arnold,* at syl. pt. 4. This is not a close case. Plaintiff was a single mother to three children who earned $14.36 an hour and who had a well-documented poor credit history. She was not a sophisticated borrower. Quicken's own records describe her as "timid," "fragile" and needing to be handled with "kid gloves." When Plaintiff declined the original $112,000 loan because the payments were too high, Quicken continued to pursue her. It tried to contact her numerous times especially after Mr. Guida's appraisal came in at almost four times the actual fair market value of the property.

Furthermore, as previously established, the loan contained a $107,015.71 balloon payment (of which Plaintiff was not aware prior to closing). The total cost of the loan was exorbitant, costing Plaintiff an additional $349,000 in monthly payments as compared to her prior mortgage and debts. From this and all of the evidence presented at trial, we conclude that the circuit court correctly found that, given the particular facts involved in this case, the terms of the loan described above and the loan product, in and of itself, were unconscionable.

### C. Cancellation of the Loan Obligation (Loan Principal)

Quicken's next assignment of error is that the circuit court lacked the legal authority to cancel Plaintiff's obligation to repay the $144,800 loan principal. It is Quicken's contention that the legislature has strictly limited the circumstances under which this remedy may be awarded under the West Virginia Consumer Credit and Protection Act and that those circumstances are absent in the case sub judice. We agree.

Cancellation of debt is a permissible remedy under the following two provisions of the Act: West Virginia Code § 46A–5–101(2) (1996) and § 46A–5–105 (1994). West Virginia Code § 46A–5–101(2) provides, in relevant part, that

> [i]f a creditor has violated the provisions of this chapter respecting authority to make regulated consumer loans, the loan is void and the consumer is not obligated to pay either the principal or the loan finance charge.

This statute specifically applies to "regulated consumer loans," which term is defined in West Virginia Code § 46A–1–102(38) (1996) as "a consumer loan ... in which the rate of the loan finance charge exceeds eighteen percent per year[.]" It is undisputed that the loan at issue is not a "regulated consumer loan," and thus, West Virginia Code § 46A–5–101(2) does not apply to give the circuit court the authority to cancel the loan such that Plaintiff is not obligated to repay the principal.

Likewise, West Virginia Code § 46A–5–105 provides that

> [i]f a creditor has willfully violated the provisions of this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice, in addition to the remedy provided in section one hundred one [§ 46A–5–101] of this article, the court may cancel the debt when the debt is not secured by a security interest.

In this case, although it has been determined that Quicken violated the provisions of Chapter 46A "applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice," Plaintiff's debt may only be canceled under West Virginia Code § 46A–5–105 if it "is not secured by a security interest." Plaintiff's loan debt is, of course, secured by a security interest. Thus, West Virginia Code § 46A–5–105 does not apply.

Although the foregoing statutory requirements were not met in this case, the circuit court canceled the debt under the illegal appraisal, unconscionability, and unfair and deceptive acts provisions of the Act, and under the common law fraud claim. We will discuss each in turn.

#### 1. Illegal appraisal

 The circuit court concluded that Quicken violated that portion of the illegal appraisal statute, West Virginia Code § 31–17–8(m)(8), which states as follows:

(m) In making any primary or subordinate mortgage loan, no licensee may, and no primary or subordinate mortgage lending transaction may, contain terms which:

. . . .

(8) Secure a primary or subordinate mortgage loan in a principal amount that, when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans secured by the same property, exceeds the fair market value of the property on the date that the latest mortgage loan is made. For purposes of this paragraph, a broker or lender may rely upon a bona fide written appraisal of the property made by an independent third-party appraiser, duly licensed or certified by the West Virginia real estate appraiser licensing and certification board and prepared in compliance with the uniform standards of professional appraisal practice[.]

As previously described, Dewey Guida, an appraiser who was unaffiliated with Quicken, appraised the subject property for $181,700. The circuit court found that Mr. Guida's appraisal was grossly inflated because the actual fair market value of the property was $46,000. In its February 25, 2010, order, the court set forth numerous "obvious flaws" that Quicken's appraisal review team ignored with regard to Mr. Guida's appraisal and further found that Quicken violated its own appraisal review standards and the Uniform Standards of Professional Appraisal Practice. See n. 10, *infra.*

The circuit court concluded that

[t]he net effect of the *negligently* performed appraisal review is that all the errors of omission and commission caused a misleading and distorted report that should not have been used as a basis for approving this loan. The misleading appraisal, which was *negligently* performed, gave [Plaintiff] a false sense as to her ability to repay this loan.

It was the intention of Quicken Loans, after the closing of this loan, to not service the loan but instead sell the loan to a third-party. The *negligently* performed appraisal review facilitated the sale of this

loan by giving any third-party purchaser a false sense as to the value of the Property. (Emphasis added).

Pursuant to West Virginia Code § 31–17–17(a) (1967), a court may cancel a loan made in violation of the provisions of West Virginia Code § 31–17–1 *et seq.*, if the violation is "willful." West Virginia Code § 31–17–17(a) states:

If any primary or subordinate mortgage loan is made in willful violation of the provisions of this article, except as a result of a bona fide error, such loan may be canceled by a court of competent jurisdiction.

Because the circuit court found Quicken's violation of West Virginia Code § 31–17–8(m)(8) to have been negligent rather than willful, the court committed error in canceling Plaintiff's mortgage obligation under that particular statute.

### 2. *Unconscionability*

■■■ As previously indicated, West Virginia Code § 46A–2–121(1)(a) and (b) provides that when a consumer loan is found to be unconscionable, a court may, among other things, "refuse to enforce the agreement[.]" It is Quicken's contention that refusal to enforce the agreement does not allow the court to cancel Plaintiff's debt. Quicken compares the language in West Virginia Code § 46A–2–121(1) with that contained in West Virginia Code § 46A–5–101(2), which, as previously discussed, provides that when a creditor violates the statutory provisions governing regulated consumer loans, "the loan is void and the consumer is not obligated to pay either the principal or the loan finance charge." Quicken argues that the legislature could have used similar language in West Virginia Code § 46A–2–121, but clearly did not do so.

■■■ This Court has consistently adhered to the principles of statutory construction set forth in syllabus points four, five and six of *Community Antenna Serv., Inc. v. Charter Communications VI, LLC,* 227 W.Va. 595, 712 S.E.2d 504 (2011), in which we stated, respectively, as follows:

Statutes which relate to the same subject matter should be read and applied

together so that the Legislature's intention can be gathered from the whole of the enactments. Syllabus Point 3, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith. Syllabus Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).

Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly. Syllabus Point 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975).

■ Furthermore, as we have made clear in prior cases, "[i]t is not for [courts] arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the

Legislature purposely omitted." *Williamson v. Greene*, 200 W.Va. 421, 426, 490 S.E.2d 23, 28(1997) (emphasis provided) (*quoting Banker v. Banker*, 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996)).

Applying these rules of statutory construction, therefore, we must conclude that although the circuit court had the authority to refuse to enforce the Note and Deed of Trust in this case pursuant to the provisions of West Virginia Code § 46A–2–121, the clear language of the statute simply does not allow the court to cancel Plaintiff's debt obligation. Therefore, this Court finds that the court committed error in canceling Plaintiff's debt obligation under West Virginia Code 46A–2–121.

### 3. Unfair and Deceptive Acts

■ Under West Virginia Code § 46A–6–104, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." In the case sub judice, the circuit court found that Quicken engaged in unfair methods of competition and unfair or deceptive acts or practices by misrepresenting to Plaintiff the extent to which she was buying down her interest rate; by "[n]ot disclosing to [Plaintiff] prior to closing that her loan had an enormous balloon payment and then not properly disclosing the balloon payment at closing;" and by "[c]onducting a negligent appraisal review and approving a loan based on a grossly inflated appraisal." Specifically, the circuit court found that this conduct met the definitions of "unfair methods of competition and unfair or deceptive acts or practices" as set forth in West Virginia Code § 46A–6–102(7)(K)(L)(M) and (N).[34]

---

**34.** West Virginia Code § 46A–6–102(7)(K)(L)(M) and (N) provide:

(7) "Unfair methods of competition and unfair or deceptive acts or practices" means and includes, but is not limited to, any one or more of the following:

. . . .

(K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(L) Engaging in any conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or

Quicken did not appeal the circuit court's conclusion that it engaged in unfair methods of competition and unfair or deceptive acts or practices.

Under West Virginia Code § 46A–6–106(a), a consumer who suffers an "ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice prohibited or declared to be unlawful by the provisions of this article may ... recover actual damages or two hundred dollars, whichever is greater. *The court may, in its discretion, provide such equitable relief as it deems necessary or proper." Id.* in relevant part. (Emphasis added). It is Quicken's contention that cancellation of Plaintiff's debt obligation (i.e., forfeiture of the loan principal) is not an equitable remedy.[35]

 The term "forfeiture" is defined, inter alia, as "[t]he loss of a right, a privilege, or property because of a crime, breach of obligation, or neglect of duty." Black's Law Dictionary 661 (7th ed.1999). In past cases, this Court has not looked favorably on forfeiture as a remedy. Rather, "[i]t is an 'elementary principle of equity jurisprudence that equity looks with disfavor upon forfeitures, and that equity never enforces a penalty or forfeiture if such can be avoided.' *Sun Lumber Co. v. Thompson Land & Coal Co.,* 138 W.Va. 68, 76, 76 S.E.2d 105, 109 (1953)." *Fraley v. Family Dollar Stores of Marlinton, W.Va., Inc.,* 188 W.Va. 35, 38, 422 S.E.2d 512, 515 (1992). As we held in syllabus point one of *Helton v. Reed,* 219 W.Va. 557, 558, 638 S.E.2d 160, 161(2006), " '[e]quity will not

enforce a forfeiture.' " (quoting Syllabus, in part, *Craig v. Hukill,* 37 W.Va. 520, 16 S.E. 363 (1892)). *See Carder v. Matthey,* 127 W.Va. 1, 7, 32 S.E.2d 640, 642 (1944) ("It is familiar law that forfeitures are not favored in courts of equity.... not only will a court of equity ordinarily refuse to act affirmatively in the enforcement of a forfeiture, but will often relieve against it.")

Plaintiff has failed to offer any authority tending to support forfeiture of the loan principal as an equitable remedy under the unfair and deceptive acts provisions of the Act, as set forth above. To the contrary, this Court finds that a balancing of the equities requires that the parties be returned to the status quo as nearly as is possible.[38] *See Go–Mart, Inc. v. Olson,* 198 W.Va. 559, 563, 482 S.E.2d 176, 180 (1996) (finding that where seller who entered into contract to sell real estate was found to have been incompetent, circuit court properly directed her to return full purchase price, thereby balancing the equities in "terms of returning the parties to the status quo ... 'as far as possible.' ").

### D. Punitive Damages

 Following the trial on the issue of liability, the circuit court conducted a trial on the issues of attorneys fees and punitive damages. Upon the conclusion thereof, the circuit court awarded attorneys fees and costs in the amount of $495,956.25 and expenses in the amount of $100,243.64, for a total of $596,199.89.[39] With regard to punitive damages,[39] the court stated in its February 17, 2011, order as follows:

conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive[.]

**35.** Quicken further argues, and Plaintiff does not dispute, that a forfeiture does not constitute "actual damages." Rather, Quicken argues, it is a windfall.

**38.** For similar reasons, forfeiture of the loan principal is not a viable remedy under Plaintiff's fraud claim.

**39.** The circuit court characterized this matter as "one of the more confusing, confounding and complex cases both factually and legally that has ever been before" it. After modifying the pro-

posed hourly rate of Plaintiff's attorneys and their staff, the court determined that the billing records submitted by Plaintiff's counsel were "both reasonable and reliable" under the guidelines set forth in *Aetna Casualty and Surety Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986). Quicken does not challenge the amount of attorneys fees awarded in this case.

**39.** The parties agree that punitive damages are available in an action for common law fraud. *Muzelak v. King Chevrolet Inc.,* 179 W.Va. 340, 368 S.E.2d 710 (1988). They further agree that "punitive damages are not available under the fraud or unconscionability provisions of W.Va. Code, § 46A–2–121 [1974], and § 46A–2–102(5) [1974]." *One Valley Bank of Oak Hill v. Bolen,* 188 W.Va. 687, 692, 425 S.E.2d 829, 834 (1992). Whether punitive damages are available under

Taking all of the *Garnes* [*v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991)], factors into consideration, including applying a factor of three times the compensatory damages and attorneys fees, [the punitive damages award] is $2,168,868.75.

This Court believes that this amount fairly applies the five standards in *Garnes* including the financial position of the defendant and as a matter of fundamental fairness, assuring that the punitive damage award bears a reasonable relationship to the compensatory damages which include the actual compensatory damages and the attorney fees.

 Quicken argues that the circuit court deprived it of procedural due process by failing to perform the required analysis of punitive damages pursuant to syllabus point three of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), in which this Court held as follows:

When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether

he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

 In syllabus point four of *Garnes,* we also held that

[w]hen the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in

the *remaining* provisions of the Act which are at issue herein is not raised by either party in this appeal. *See e.g., Muzelak,* 179 W.Va. at 344, 368 S.E.2d at 715 (where plaintiff alleged claim of "statutory misrepresentation and unfair or deceptive acts" based upon West Virginia Code § 46A–6–102(f)(13) [1974], defendant argued plaintiff was limited to actual damages under the language of West Virginia Code § 46A–6–106

and that trial court committed error in giving punitive damages instruction to jury. This Court stated that "we need not decide today whether Mrs. Muzelak may recover punitive damages under W.Va.Code § 46A–6–102(f)(13) [1974] because Mrs. Muzelak also pleaded and proved a cause of action for common law misrepresentation or fraud."). We, therefore, will not address the issue in this case.

some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

 In the case sub judice, the circuit court's conclusory order on punitive damages fails to satisfy the requirements set forth in *Garnes.* Even though this matter was tried before a judge rather than a jury, it was necessary for the circuit court to conduct a meaningful and adequate analysis under *Garnes* so that this Court may, in turn, conduct a meaningful and adequate review of the award on appeal. *Id.* 186 W.Va. at 667, 413 S.E.2d at 908. As we held in syllabus point five of *Garnes,*

> Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

*See* Syl. Pt. 5, *Alkire v. First Nat'l Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996).

Because the circuit court's order on punitive damages lacked the necessary analysis and findings required by *Garnes,* this Court is unable to conduct a meaningful and adequate review of the punitive damages award. *See State ex rel. Harper–Adams v. Murray,* 224 W.Va. 86, 680 S.E.2d 101 (2009). Because the circuit court failed to conduct a proper analysis under *Garnes,* such an analysis must be conducted upon remand.

### E. Attorneys Fees as Compensatory Damages

 Quicken's next assignment of error is that the circuit court committed error by including attorneys fees in its calculation of the punitive damages award. As indicated above, the circuit court took "all of the *Garnes* factors into consideration, including applying a factor of three times the compensatory damages and attorneys fees" and awarded punitive damages in the amount of $2,168,868.75.[40] It is Quicken's contention that attorneys fees are punitive in nature and not compensatory and thus, may not be included in the ratio of compensatory to punitive damages.

The circuit court awarded Plaintiff attorneys fees and costs pursuant to West Virginia Code § 46A–5–104 of the West Virginia Consumer Credit and Protection Act, which provides as follows:

> In any claim brought under this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice, the court may award all or a portion of the costs of litigation, including reasonable attorney fees, court costs and fees, to the consumer. On a finding by the court that a claim brought under this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice was brought in bad faith and for the purposes of harassment, the court may award to the defendant reasonable attorney fees.

Quicken does not challenge the applicability of this fee-shifting statute to the facts and circumstances of this case.

---

**40.** *See* Syl. Pt. 6, *Boyd v. Goffoli,* 216 W.Va. 552, 608 S.E.2d 169 (2004) (explaining that " '[t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional.' Syllabus Point 15, *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *affirmed by* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)'").

This Court has recognized the Consumer Credit and Protection Act to be "a remedial statute intended to protect consumers from unfair, illegal and deceptive business practices, [which] must be liberally construed to accomplish that purpose." *Harper v. Jackson Hewitt, Inc.*, 227 W.Va. 142, 151, 706 S.E.2d 63, 72 (2010). *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995). Though not specifically articulated in our Act, other jurisdictions have made clear that their consumer protection fee-shifting provisions are compensatory in nature. *See Alexander v. S & M Motors, Inc.*, 28 S.W.3d 303, 305 (Ky.2000) (stating that Kentucky Consumer Protection Act is " 'intended [inter alia] to compensate the prevailing party for the expense of bringing an action under the statute.' " (internal citation omitted)); *Gordan v. Archer*, 1999 WL 788548 *2 (Mass. App.Div.1999) (finding that attorneys fees awarded under Massachusetts consumer protection fee-shifting statute "are assessed in an amount equal to the reasonable and objective worth of plaintiff counsel's professional time and effort.... and are construed as strictly compensatory in nature."); *Wilkins v. Peninsula Motor Cars, Inc.*, 266 Va. 558, 587 S.E.2d 581, 584 (2003) (stating that purpose of statutory award of attorneys fees and costs under Virginia Consumer Protection Act differs from purposes of punitive damages, the latter of which is designed to punish and deter unlawful conduct, whereas "fee shifting provisions ... are designed to encourage private enforcement of" statute).

Likewise, the purpose of fee-shifting statutes similar to West Virginia Code § 46A–5–104, above, have been considered by this Court to be compensatory in nature. For example, in *Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 639, 281 S.E.2d 238, 244 (1981), former employees of a defunct strip mine operator sought to recover from the coal rights' lessee unpaid wages, accrued vacation and sick pay, liquidated damages and attorneys fees and costs. Upon holding that an award of attorneys fees was warranted under the fee-shifting provision of the West Virginia Wage Payment and Collection Act, this Court stated that the statutory provisions at issue

are designed to protect the laborer and act as an aid in the collection of compensation wrongfully withheld. Working people should not have to resort to lawsuits *to collect wages they have earned.* When, however, resort to such action is necessary, the Legislature has said that *they are entitled to be made whole by the payment of* wages, liquidated damages, and costs, *including attorney fees.* If the laborer were required to pay attorney fees out of an award intended to compensate him for services performed, the policy of these statutes would be frustrated.

*Farley,* 167 W.Va. at 639, 281 S.E.2d at 244 (emphasis added).

Likewise, in *Orndorff v. West Virginia Dept. of Health,* 165 W.Va. 1, 4, 267 S.E.2d 430, 432 (1980), which involved a plaintiff who was unlawfully denied civil service employment, this Court concluded that the plaintiff was entitled to reasonable attorneys' fees under the applicable fee-shifting statute. In addressing the "scope of the right to obtain" such fees in a civil reinstatement proceeding, we recognized that

[o]ne obvious purpose of a provision for reasonable attorney fees is to provide a measure of *restitution* to a civil service employee who has been wrongfully discharged or suspended and, as a result, forced to hire an attorney to seek redress. Equally apparent is another goal, to provide an inducement to the employee who has been wrongfully discharged to challenge the action since, if successful, *he is relieved of the burden of paying reasonable attorney fees.*

*Orndorff,* 165 W.Va. at 4–5, 267 S.E.2d at 432 (emphasis added). *See Daily Gazette Co., Inc. v. West Virginia Development Office,* 206 W.Va. 51, 58, 521 S.E.2d 543, 550 (1999) (stating that FOIA's fee-shifting statute, W.Va.Code § 29B–1–7, "which is a marked departure from the general rule that each party bears his/her own litigation costs, is intended to *relieve some of the burden associated with the public's pursuit of the right* to access public records and to encourage the cooperation of public officials when requests for such records are made." (Footnote omit-

ted and emphasis added)); syl. pt. 14, *Bettinger v. Bettinger,* 183 W.Va. 528, 396 S.E.2d 709 (1990) (holding that "[t]he purpose of W.Va.Code, 48–2–13(a)(4)(1986), is to enable a spouse who does not have financial resources to obtain *reimbursement for costs and attorney's fees* [incurred] during the course of the litigation." (Emphasis added)).

Furthermore, we are mindful of cases from other jurisdictions in which attorneys fees awarded pursuant to a fee-shifting statute were included as compensatory damages in the ratio of compensatory to punitive damages. In *Willow Inn, Inc. v. Public Service Mut. Ins. Co.,* 399 F.3d 224 (3rd Cir.2005), the insured, Willow Inn, sued its insurer under Pennsylvania's bad faith statute after the insured "encountered sustained resistance to its insurance claim" for property damage resulting from a tornado. 399 F.3d at 227. In the bad faith claim, the insured was awarded $150,000 in punitive damages and attorneys fees and costs in the amount of $135,400. The United States Court of Appeals for the Third Circuit concluded the attorneys fees and costs awarded under the applicable fee-shifting statute to be "the proper term to compare to the punitive damages award for ratio purposes." *Id.,* at 235. The court reasoned, in part, that the statute's fee-shifting provisions "vindicate the statute's policy by enabling plaintiffs such as Willow Inn to bring ... actions alleging bad faith delays [and] to secure counsel on a contingency fee." *Id.,* at 236. The court thus concluded that attorneys fees and costs awarded pursuant to the applicable fee-shifting statute are compensatory damages for "ratio purposes." *Id.,* at 237.

Similarly, in *Blount v. Stroud,* 395 Ill. App.3d 8, 333 Ill.Dec. 854, 915 N.E.2d 925 (2009), the court recognized "that the amount of attorney fees expended in a case may be taken into account when assessing the propriety of a punitive damage award." 333

Ill.Dec. 854, 915 N.E.2d at 943. In *Blount,* the plaintiff prevailed in a retaliation claim against her former employer under the United States Civil Rights Act of 1991 and was awarded attorneys fees under the fee-shifting provision of the statute.[41] The court in *Blount* made clear that the fee-shifting provision of the Civil Rights Act, 42 U.S.C.1988, is remedial in nature and not punitive. Its purpose "is to ensure effective access to the judicial process for persons with civil rights claims and to encourage litigation to enforce the provisions of the Civil Rights Act and the Constitution" *Id.,* 333 Ill.Dec. 854, 915 N.E.2d at 944. Thus, the court in *Blount* concluded that the attorneys fees awarded under the fee-shifting provision of the Civil Rights Act "should be counted on the compensatory side" of the compensatory to punitive damages ratio. *Id.,* 333 Ill.Dec. 854, 915 N.E.2d at 945. *See Clausen v. Icicle Seafoods, Inc.,* 174 Wash.2d 70, 272 P.3d 827, 836 (2012) (holding that "recovery of attorney fees is compensatory in that those fees attempt to make [plaintiff] whole for the employer's actions in intentionally failing in its maritime duty to provide maintenance and cure. It was proper for trial court to include attorney fees as part of the compensatory damages award when calculating the punitive damages ratio.")

In light of the foregoing, and considering this Court's past recognition that, in general, fee-shifting statutes are compensatory and not punitive in nature, we find persuasive the argument that the attorneys fees and costs awarded under West Virginia Code § 46A–5–104 shall be included in the compensatory to punitive damages ratio[42] where, as here, punitive damages are available to Plaintiff because there was a finding of common law fraud. Accordingly, we hold that attorneys fees and costs awarded under West Virginia Code § 46A–5–104 (1994) of the West Virginia Consumer Credit and Protection Act shall be included in the compensatory to

---

**41.** In *Blount,* the jury awarded plaintiff compensatory damages in the amount of $282,350, for physical and/or emotional pain and suffering and back pay. She was also awarded in excess of $1,000,000 in attorneys fees and costs under the fee-shifting provision of the Civil Rights Act. The jury awarded her $2.8 million in punitive damages.

**42.** Indeed, this is wholly consistent with *Garnes,* which directs that review of a punitive damages award should, at a minimum, consider, among other factors, "[t]he costs of the litigation." *Garnes,* at syl. pt. 4, 186 W.Va. at 659, 413 S.E.2d at 900.

punitive damages ratio in cases where punitive damages are available.[43]

### F. Offset

■ Quicken's final assignment of error is that the circuit court committed error in failing to offset the compensatory damages award against Plaintiff's pre-trial settlement with co-defendants Appraisals Unlimited, Inc. and appraiser Dewey Guida. Quicken represents that Plaintiff settled with these parties for the amount of $700,000 and that, because all of Plaintiff's damages flowed from the inflated appraisal by Mr. Guida and his company, Plaintiff is entitled to an offset as a matter of law.

The circuit court entered the judgment order in this case on February 17, 2011. Quicken filed its motion for offset on April 8, 2011, and the circuit court summarily denied it by order entered May 2, 2011. Although the circuit court offered no explanation for its ruling, Plaintiff argues that Quicken failed to file its motion within ten days of the entry of judgment, pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure.

Despite Plaintiff's argument to the contrary, the issue of offset is governed by Rule 60(a) of the West Virginia Rules of Civil Procedure and this Court's decision in *Savage v. Booth*, 196 W.Va. 65, 468 S.E.2d 318 (1996). In *Savage*, during the pendency of a sexual harassment trial, the plaintiffs settled with one of the defendants for $50,000. The trial against the remaining defendant proceeded to a jury verdict for $40,000. The judgment order "gave no credit nor made any reference to the settlement agreement." 196 W.Va. at 67, 468 S.E.2d at 320. Three months after the entry of judgment, the defendant filed a Rule 60 motion to, inter alia,

"give credit for the $50,000 settlement ... and to enter a new order stating that there is no balance due the plaintiffs from the defendant." *Id.* The trial court ultimately denied the defendant's motion because he failed to timely file it pursuant to Rule 59(e).

■ On appeal, this Court reiterated that

Rule 60(a) of the West Virginia Rules of Civil Procedure applies to clerical errors made through oversight or omission which are part of the record and is not intended to adversely affect the rights of the parties or alter the substance of the order, judgment or record beyond what was intended.

*Id.*, at syl. pt. 3, 196 W.Va. at 66, 468 S.E.2d at 319.[44]

This Court in *Savage* concluded "as a matter of law that upon the defendant's motion the trial court was required to deduct the settlement amount from the jury verdict prior to entering the final judgment. The trial court's initial failure to give such credit was a mere oversight and does not arise to the level of more substantial errors which must be considered pursuant to Rule 59(e) or Rule 60(b)." *Id.*, 196 W.Va. at 70, 468 S.E.2d at 323.

According to Quicken, Plaintiff suffered a single indivisible loss and, thus, she is entitled to but one complete satisfaction for her injury. *Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990). *See Pennington v. Bluefield Orthopedics, P.C.*, 187 W.Va. 344, 349, 419 S.E.2d 8, 13 (1992). Plaintiff counters (albeit very superficially) that Quicken fails to meet the " 'joint obligation' and/or 'single indivisible injury' " elements under *Zando*.

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

**43.** We note Quicken's additional argument that because attorneys fees in this case were awarded under West Virginia Code § 46A–5–104 of the Consumer Credit and Protection Act and because, Quicken maintains, the Act does not allow a punitive damages award, it was not "logical" for the circuit court to consider the attorneys fees award in its calculation of punitive damages. Plaintiff provides this Court with no legal authority in support of this argument. We, therefore, decline to address it.

**44.** Rule 60(a) of the West Virginia Rules of Civil Procedure provides as follows:

■ In syllabus point eight of *Zando*, we held, in relevant part, that

> [w]here there is a single indivisible loss arising from the actions of multiple parties who have contributed to the loss, the fact that different theories of liability have been asserted against them does not ... prevent them from obtaining a verdict credit for settlements made with the plaintiff by one or more of those jointly responsible.

182 W.Va. at 600, 390 S.E.2d at 799.

Accordingly, given that Plaintiff does not seriously argue otherwise, it is clear that Plaintiff suffered a single indivisible loss arising from the actions of Quicken and the settling co-defendants. Quicken is therefore entitled to a credit for the settlement between Plaintiff and the appraisal defendants, pursuant to Rule 60(a) and *Savage*.

■ Finally, we note that the parties are in agreement that any credit for the settlement between Plaintiff and Quicken's co-defendants is not to be applied to any punitive damages which may be awarded upon remand in this case. As we held in syllabus point one of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996),

> [d]efendants in a civil action against whom awards of compensatory and punitive damages are rendered are entitled to a reduction of the compensatory damage award, but not the punitive damage award, by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties.

## IV. Conclusion

For the reasons stated herein, the order of the Circuit Court of Ohio County entered May 2, 2011, is affirmed, in part; reversed, in part; and this matter is remanded for further proceedings consistent with this opinion.

Affirmed, in part; Reversed, in part; and Remanded.