MARJORIE M. BOND

*v.*

WILLIAM J. B. BOND, JR.

(No. 11033)

Submitted April 28, 1959.     Decided June 2, 1959.

*Horace S. Meldahl,* for appellant.

No appearance for appellee.

CALHOUN, JUDGE:

This case is before this Court upon appeal from the judgment of the Circuit Court of Cabell County, refusing to grant an appeal from the domestic relations court of that county.

In a suit for divorce, instituted in the domestic relations court, Marjorie M. Bond, hereinafter referred to as "plaintiff", was granted a divorce on June 18, 1957, from William J. B. Bond, Jr., her husband, herein referred to as the "defendant". By the divorce decree, the plaintiff was granted custody of the three infant children born to the marriage union "with the right and privilege reserved to defendant to visit and see said children, at reasonable times, and so long as defendant conducts himself in a proper and decorous manner upon such visitations". The decree also gave the plaintiff the right to occupy, with the infant children, the home owned jointly by the parties and to use the contents thereof. The decree further required the defendant to pay monthly to his wife the sum of $25.00 as alimony, and a like sum for the support of each child, aggregating the

monthly sum of $100.00. In addition, the decree required the defendant to continue to pay the monthly payments of $46.10 in reduction of a lien indebtedness on the residence property.

On August 14, 1957, the defendant gave notice to the plaintiff that, on August 19, 1957, he would apply to the domestic relations court for a modification of the provisions of the divorce decree. His petition filed in pursuance of the notice prayed: "That the use of the dwelling house by the plaintiff be limited to serving as a home for *she* and said infant children and not as a meeting place for the Jehovah's Witnesses; that the petitioner be allowed to see and be with said infant children during a definite space of time each week; that the payment of the alimony, provided in said former decree, be curtailed so long as the plaintiff is employed, * * *". To this petition plaintiff filed her answer praying: "Your respondent, therefore, prays that the petition, filed against her, may be dismissed; that this Honorable Court will increase the support and maintenance provided for the infant children of the parties hereto, to such sums as will adequately support said children and to which this court shall seem just and reasonable. Your respondent further prays that the petitioner herein be required to pay to her a sufficient sum of money to pay her reasonable court costs and attorney fees in this cause expended and for such other and special and general relief as to the court shall seem proper."

On August 26, 1957, a hearing was had before the court on the petition and answer thereto. In support of his petition the defendant expressed a desire that the court fix a definite formula for his visits with his three children. Specifically, he requested that he be given the privilege of having the children each Saturday evening from six o'clock to nine o'clock. Thereafter questions were propounded to the witness and he gave answers as follows:

"Q. Are you asking the Court to restrict the

use of this dwelling house for residential purposes only?

"A. Yes, sir.

"Q. Now, on what basis are you making that request, will you tell the Court?

"A. On the basis that they are using the home as a meeting place and a place of worship for a religious organization by the name of Jehovah's Witnesses.

"Q. Are these regular meetings for the whole Jehovah's Witnesses congregation, I should say, or what?

"A. Yes, sir, they are welcome as I understand, but they are also gathering women from the neighborhood to come in in the afternoon and have meetings.

"Q. And because of this you are asking the Court to restrict—not to restrict the use but that the use of the dwelling house be used for residential purposes only?

"A. Yes, sir.

On cross-examination questions were asked and the witness gave answers as follows:

"Q. Are you familiar with the organization known as Jehovah's Witnesses?

"A. Yes, sir, I am.

"Q. Is it your feeling that there is anything wrong with the Jehovah's Witnesses Church?

"A. Yes, sir.

"Q. Would you mind stating what your objections are?

"A. I would like to begin quite a few years ago if I may.

"* * *.

"A: A few years ago the oldest boy which is nine now went to school and when she had joined the Jehovah's Witnesses, she refused the

boy the right to say the allegiance to the flag and in turn that made him nervous and we have taken him to doctors to find out what was the matter with him and we found out there was nothing the matter with him outside of a nervous condition and then I found out that she went so far as to go down to school and refused for the boy to say the allegiance to the flag and then she kept the boy from playing in the yard by making him read the literature which took him around an hour and a half.

"Q. That was how long ago?

"A. That particular part there was last summer and she threatened to whip him or if he didn't go to the meetings she would put him to bed. Then they don't believe in voting. They don't believe in saluting the flag and they don't believe in fighting and they don't believe in hell and they don't believe in the blood and they don't believe in Thanksgiving and they don't believe in Christmas, New Year's or any type of celebration.

"Q. And I take it from your objecting to what you have enumerated here that you believe in just the opposite of all those particular items?

"A. Yes, sir, I do."

Thereupon, counsel for the husband interposed an objection as follows:

"The basis of the objection, your Honor, is that this is not proper cross examination, and further, that this line of questioning is going into the merits of the particular religious sect and that in no place in the petition or notice filed herein is there any objection made so far as Mr. Bond is concerned as to her religion. In asking the Court to restrict—not to restrict but to limit the use of this dwelling house for residential purposes only is not to restrict Mrs. Bond in any form whatsoever in her religion and I believe that the testimony in the cross examination here is away off base and has nothing to do with the matters contained in the

notice and petition and further, that it delves into the merits which I believe that none of us possibly should entertain at the present time. I object to that line of questioning."

The cross-examination of defendant was quite lengthy, dealing almost entirely with the tenets of Jehovah's Witnesses. At the conclusion thereof the defendant rested his case. The plaintiff then testified in support of her answer, followed by Billy Bond, age nine, the son of the parties hereto. Ten additional witnesses testified in behalf of plaintiff, all affiliated with Jehovah's Witnesses. The entire testimony in behalf of plaintiff was in the main given as an explanation or justification of the tenets, beliefs and religious practices of Jehovah's Witnesses. It would serve no good purpose to relate such testimony in detail. From the entire record, however, it is obvious that the defendant is quite impatient with many of such tenets, beliefs and religious practices, and that he does not want the three infant children to be subject to the influence thereof. It is at this point that the unfortunate battle line is formed.

Marjorie M. Bond testified as follows concerning the use of her home for religious services:

"Q. Will you tell the Court what religious activities, if any, have been carried on in your home?

"A. I have a Wednesday night Bible study and before the Bible study those that want to come and go out in the service for an hour can and they come at seven and they are gone by about five minutes after seven; and on Saturday they meet and they are there about fifteen minutes and they go out in magazine work then and on Sunday morning they meet and they are there about fifteen minutes and they go out with the bound books.

"Q. Is that all the use that is made of your home for religious purposes of any kind?

"A. Occasionally on Tuesday night the conductor is there with his wife and sometimes

their children, for the back calls. That is on the placements they have made and they call back on people.

"Q. How long does that last?

"A. Sometimes ten minutes.

"Q. When you have a Bible study in your home, what does that consist of?

"A. Well, now we are studying, How You May Survive Armageddon Into God's New World.

"Q. Now, do you have any material furnished you for the purpose of studying that particular subject?

"A. Well, I have brought my book, my bound book.

"Q. What is presented in that book?

"A. Well, it just pertains to subjects taken up in the Bible about Armageddon.

"Q. And all the things that are pointed out are based upon statements found in the Bible?

"A. Yes, sir. There are scripture references for every chapter.

"Q. And they give you exactly the place they are found in the Bible?

"A. Yes, and we always read them.

"Q. And when you study the Bible, just how do you study it?

"A. Well, I try to use my bound books because they present all the scriptures pertaining to one certain subject. They bring them all together and then we can get a clear picture of them.

"Q. Is that what is called studying the Bible topically?

"A. Yes, sir.

"Q. You take up a topic and you consider everything the Bible says on that particular

topic so that you feel you get a correct understanding about what the Bible teaches?

"A. Yes, sir.

"Q. Do you do anything else at these Bible studies other than that?

"A. No.

"Q. How long do these Bible studies last?

"A. One hour.

"Q. And that is all?

"A. That is all.

"Q. And other than this Bible study and meeting to consider who to make back calls on, then the only other use you make of your home is for the people that are going to distribute literature or call upon people in this religious work, to meet and start from there, is that right?

"A. That's right.

"Q. All right. Now, to what extent do you require your children to participate in any of this religious work?

"A. They sit in on the Wednesday night Bible study because it lasts an hour and you can't let the children be out for an hour at a time without knowing what they are doing. That is the way I feel about it. I think they should learn as much as they can about the Bible.

"Q. What do you do if anything to cause the children to attend those Bible studies?

"A. Well, when it is time I just make them take their baths or call them in and they take their baths. They don't object to it.

"Q. Have the children complained about having to participate in this work?

"A. Not what you say really complain. You know children complain about a lot of things. Any child would rather play than sit down and

listen to anything, but usually I call them the second time and they will come in and get cleaned up. They look forward to it.

"Q. And other than the oldest boy, do the younger ones participate in this religious work?

"A. No, sir.

"Q. The only one is just the oldest boy?

"A. Yes, sir. Now, I have taken the other two along with me but they take no part in the magazine work, I mean.

"Q. Do you do that very often?

"A. No.

"Q. Now, when you don't take them with you, what arrangements do you make for them?

"A. When I don't take them with me, I stay home. I don't leave them at neighbors' homes.

"Q. You don't leave them to run wild in the neighborhood, do you?

"A. No."

Following the original cross-examination, the court propounded certain questions and the plaintiff gave answers as follows:

"Q. Do you believe that you are obligated to obey the laws of the Country?

"A. Yes, to the best of my ability. Jesus said, pay to Caesar those things that are Caesar's and to God the things that are God's.

"Q. And what was he referring to when he was referring to Caesar? Wasn't he referring to the Roman government?

"A. Yes.

"Q. How do you reconcile your position as not voting as a citizen of the government of which you are a member?

"A. Jesus didn't vote and he sets the example for us.

"Q.  Is that one reason why you will not pledge allegiance to the flag?

"A.  That is an act of worship to an image, saluting or pledging of allegiance.

"Q.  Is that your interpretation of pledging allegiance to the flag, that you are worshipping the flag of the United States?

"A.  Yes, sir.

"Q.  And not acknowledging it as the symbol of the sovereign under which you live and breathe and have your being?

"The witness: Yes, sir, I know it is the symbol of the sovereign, but we owe our life to God and we breathe by God's grace and not by the laws of the lands.

"The Court:  Just one other question.  The Court wants to ask you this question, do you have the custody of these children?

"A.  Yes, sir.

"Q.  Do you intend to bring them up in that belief that you have just stated?

"A.  Yes, sir, I do."

On April 10, 1958, the court entered a decree, dated January 25, 1958, a portion of which is as follows:

"Upon consideration of the proceeding had herein, the Court is of the opinion and does decree that it acquired jurisdiction of said infant children on the 28th day of November, 1956, at the time the Plaintiff, Marjorie M. Bond, filed her bill of complaint herein praying for a divorce from the Defendant, William J. B. Bond, Jr., and that on the 18th day of June, 1957, a decree of divorce was awarded the said Plaintiff, against the said Defendant, and Plaintiff was awarded the legal custody of said three infant children together with the exclusive right to use and occupy said residence with all the household goods and furnishings therein contained as a home for Plaintiff and the said

children; that the Court may, at any time, upon proper application made by petition pursuant to law, modify its former decree or decrees if the welfare and best interests of said children require such to be done.

"The Court upon consideration of the testimony and evidence submitted herein does find that the Plaintiff, Marjorie M. Bond, did, after said divorce decree was entered awarding to her the custody of the said children and exclusive use of said residence together with all the household goods and furnishings therein to be used as a home for Plaintiff and the said children, hold and permit others to hold meetings of Jehovah's Witnesses in said home, and designated said home as a regular meeting place of said Jehovah's Witnesses, and did while said meetings were being held require said infant children to be present and in attendance at said meetings, and that said meetings sometimes continued for periods as long as three hours during which periods the said children were required to be in attendance, and that said children ranged in ages from five to nine years and while many of said meetings were being held manifested displeasure, discomfort, and nervousness; that said children were instructed in some of said meetings by said Jehovah's Witnesses in the home set apart for the Plaintiff and said children not to pledge allegiance to the flag of the United States of America, not to vote in matters pertaining to Government and not to bear arms in defense of their country, even if it were being attacked by a foreign power seeking to destroy or subject same to capture and ruin, to which ruling of the Court the Plaintiff objects and excepts.

"Upon consideration of the testimony taken herein the Court is of the opinion and does decree that the holding of said meetings in said residence jointly owned by the parties hereto is detrimental to the best interests and welfare of the said three children, and that by reason thereof this Court does award the injunction prayed for, to which ruling of the Court the

Plaintiff objects and excepts, and it is therefore adjudged, ordered and decreed that the plaintiff, Marjorie M. Bond, be and she is hereby enjoined, restrained, and prohibited from holding, or permitting others to hold meetings of Jehovah's Witnesses in the home owned jointly by the said Plaintiff and the said Defendant at 1809 Jefferson Avenue, in the City of Huntington, Cabell County, West Virginia, to which ruling of the Court the Plaintiff objects and excepts.

"It is further adjudged, ordered and decreed, that the defendant, William J. B. Bond, Jr., be and he is hereby granted the right of visitation with the said children on Saturday of each week from six o'clock P. M. to nine o'clock P. M., at said home owned jointly by the said Plaintiff and the said Defendant or elsewhere without the said Plaintiff being present during said time or times of visitation, to which ruling of the Court the Plaintiff objects and excepts.

"It is further adjudged, ordered and decreed that the alimony and maintenance for the Plaintiff and said children provided in the order entered herein on the 18th day of June, 1957, be and remain in full force and effect, to which ruling of the Court the Plaintiff and Defendant object and except.

"It is further adjudged, ordered and decreed that the issues joined by the parties in the pleadings found herein do not require a decision of the Court concerning the right or rights of the Plaintiff, Marjorie M. Bond, to worship as a Jehovah's Witness, to which ruling of the Court the Plaintiff objects and excepts.

"It is further adjudged, ordered and decreed that the Plaintiff, Marjorie M. Bond, pay the cost of reporting and transcribing the evidence taken herein because it was at her direction that same was done, the fees of her Counsel representing her herein, and all other costs incurred by her in this proceedings, excepting an attorney fee of Fifty Dollars ($50.00) which the Court directs the defendant William J. B. Bond, Jr., to pay to the Plaintiff, Marjorie M.

> Bond, the Court upon consideration of the motion of the Plaintiff for costs and attorney fees finding that the sum of Fifty Dollars ($50.00) is just, adequate and reasonable, and that any additional attorney fees paid or incurred by her in this matter is due as a result of the Plaintiff failing to confine the testimony presented by her to the issues joined in the pleadings filed herein, to which ruling of the Court the Plaintiff and Defendant object and except, and the Court further adjudges, orders and decrees, that the Defendant, William J. B. Bond, Jr., pay to the Plaintiff, Marjorie M. Bond, the sum of Three Dollars ($3.00) to reimburse her for the fee paid the Clerk of this Court at the time of the filing of her said answer herein, to which ruling of the Court the Defendant objects and excepts."

On July 25, 1958, the circuit court entered an order refusing an appeal from the judgment of the domestic relations court, and refusing to dissolve the injunction, on the ground that the judgment was "plainly right".

The questions presented relate to: (a) The restraints placed upon plaintiff in the use of the home; and (b) the decretal provisions dealing with attorney fees, court costs and support.

It is fundamental in the history of this nation that the original settlers came to America, in a great measure, in pursuit of religious freedom. It was quite natural, therefore, that the founding fathers gave particular emphasis to that aspect of liberty in the architecture of the new nation. Cooley's Constitutional Limitations, (8th Ed.) Vol. 2, page 960.

Article VI of the Constitution of the United States provides that: "* * * no religious Test shall ever be required as a Qualification to any Office or public Trust, under the United States"; and by the First Amendment it is further provided that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

"These provisions effectually guarantee the religious liberty of the individual against infringement by the federal government, or agencies of the federal government, but they constitute no protection against action by the states. While the states formerly were restrained only by limitations of their own respective constitutions, the due process clause of the Fourteenth Amendment to the federal constitution now safeguards religious liberty from state interference". 16 C. J. S., Constitutional Law, Section 206(1), pages 1018 and 1019.

In the Constitution of the State of West Virginia, Article III, Section 16, provides that: "The right of the people to assemble in a peaceable manner, to consult for the common good, * * * shall be held inviolate." Article III, Section 7 provides in part: "No law abridging the freedom of speech, or of the press, shall be passed; * * *". Article III, Section 1, deals in part with "* * * the enjoyment of life and liberty with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety." Article III, Section 15, deals more specifically and at length with religious freedom as follows:

"No man shall be compelled to frequent or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or belief, but all men shall be free to profess, and by argument, to maintain their opinions in matters of religion; and the same shall, in no wise, affect, diminish or enlarge their civil capacities; and the Legislature shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this State, to levy on themselves, or others, any tax for the erection or repair of any house for public worship, or for the support of any church or ministry, but it shall be left free for every person

> to select his religious instructor, and to make for his support, such private contract as he shall please."

Perhaps no single individual has made a greater contribution to the cause of religious liberty in the United States than the immortal Thomas Jefferson. He proudly proclaimed his authorship of the Virginia Statute of Religious Freedom, which was enacted in 1785 and which has formed a part of the Virginia Code to this date. It is said to have formed a model for statutes and constitutional provisions throughout the land. 4 W. & L. Law Rev. 35; 12 Va. Law Rev. 632; *Jones* v. *Commonwealth,* 185 Va. 335, 38 S. E. 2d 444. Its language is carried almost verbatim in Article III, Section 15 of the Constitution of West Virginia.

The Virginia Statute of Religious Freedom was considered in the case of *Jones* v. *Commonwealth,* 185 Va. 335, 38 S. E. 2d 444. From the opinion in that case it appears that two juveniles had been adjudged to be delinquent and each was released upon probation upon condition that he "attend Sunday School and Church each Sunday hereafter for a period of one year * * *." The Court, in holding that such condition of probation violated constitutional requirements of religious freedom, stated: "There is preserved and assured to each individual the right to determine for himself all questions which relate to his relation with the Creator of the Universe. No civil authority has the right to require any one to accept or reject any religious belief or to contribute any support thereto."

The case of *United States ex rel. Hoce* v. *McGinnis,* 56 F. Supp. 668 (W. Va.), involved a *habeas corpus* proceeding to test the validity of petitioner's detention on a charge of failure to report for induction into the armed services. The background of the case is stated in the Court's opinion as follows:

> "In the volume of litigation incident to the enforcement of the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, Sec-

tion 301 et seq., the name of Jehovah's Witnesses is writ large and encountered often. The Witnesses are an ultra and uncompromising religious sect whose members profess allegiance to a visionary heavenly kingdom and disclaim all duties of citizenship which they deem in conflict with such heavenly allegiance. In the utmost good faith they unhesitatingly choose to suffer whatever penalties the law may impose rather than to abate one jot or tittle their zealously held doctrine of primary responsibility to the super-mundane sovereignty which they consider themselves bound to serve. In short, they are religious zealots, possessing in ample measure the qualities which have ever characterized those who devote themselves wholly to theological abstractions to the exclusion of all regard . for the practical affairs of life and the duties of citizenship.

"Courts have been prompt to vindicate the Constitutional rights of Jehovah's Witnesses to freedom of speech and of religion whenever these have been called in question; but they have been equally careful to point out and enforce the superior obligation resting upon these sectaries, in common with all other citizens, to bear arms in defense of their country if required to do so. The Witnesses lay the flattering unction of the vindication suavely to their souls, but recognize the obligation with great reluctance, if at all."

The case of *West Virginia State Board of Education* v *Barnette*, 63 S. Ct. 1178, 319 U. S. 624, 87 L. ed., 1628, 147 A.L.R. 674, involved West Virginia laws and a regulation of the State Board of Education requiring pupils in public schools of the State to salute the flag of the United States, and to repeat a pledge of allegiance thereto. In upholding the right of an individual to refuse to salute the flag or pledge allegiance thereto, the Court stated: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us."

Texts and decisions of appellate courts dealing with the fundamental nature of religious liberty are almost without limit. "Such guaranties extend to persons of all creeds and religious beliefs or disbeliefs; religion is not defined under the guaranties, and the constitutional protection is not restricted to orthodox religious practices, and freedom of religious belief belongs to those whose beliefs are disapproved as well as to those whose tenets are approved". 16 C. J. S., Constitutional Law, Section 206(1), page 1025. Such guaranties are binding upon courts as upon all others in government. 16 C. J. S., Constitutional Law, Section 206(1), page 1028.

If living together, the father and mother have equal rights in the custody, care, instruction and training of their minor children. Code, Chapter 44, Article 10, Section 7. But where, as here, the matrimonial craft is not sufficiently strong to weather the storms by which it may be buffeted, the infant children are the resulting and unfortunate flotsam. Then follows the duty of the court, often the most onerous and perplexing, to make that disposition of custody which appears most likely to subserve the best interests of the infants concerned. In such a background, the infant children in this case were placed in the custody of their mother because obviously that was deemed to be in their best interests.

The husband now seeks to restrict or limit that custody. It is not shown that the children are being neglected in the usual sense; that they are abused or mistreated; or that they are subjected to any evil or immoral influence. While it appears that the home is used somewhat infrequently for small religious gatherings of Jehovah's Witnesses, it does not appear that such gatherings are characterized by loud noises, misconduct or any other sort of lack of decorum. Nor does it appear that the dwelling property is being defaced or abused. In essence, the husband displays a keen impatience with the

tenets, teachings, beliefs and practices of Jehovah's Witnesses; he does not want his children reared in that religious faith; and, obviously, it is for this purpose that the defendant seeks to restrict the nature of the use the plaintiff and the infant children shall make of the home.

In the case of *Cory* v. *Cory*, 70 Cal. App. 2d 563, 161 P. 2d 385, a divorce decree awarded custody of minor children to the wife. The husband petitioned the court to give him custody of the minor children. His reasons assigned were that the wife was a Jehovah's Witness, that the home was being used as a gathering place for people of such religious affiliation, and otherwise his complaint was similar to that of the husband in the instant case, though more detailed. In refusing to disturb custody in the wife, the Court stated:

> "We have been cited to no case, and believe none will be found, wherein it has been held that the courts may deprive parents of the custody of their offspring because of a disagreement with such parents as to their religious views, at least, as long as their teachings do not conflict with the laws of the land. While respondent argues in his brief that there is no religious issue in this case, and asserts that the question is whether a father should have the right to have his children taught the 'principles of good citizenship,' it is patent that both respondent and the trial court are of the opinion that the religious teachings of appellant are incompatible with what *they* consider the 'principles of good citizenship.'"

In the case of *Reynolds* v. *Rayborn*, Tex. Civ. App., 116 S. W. 2d 836, the trial court had removed custody of an infant daughter from the father because the father and the child were Jehovah's Witnesses. The appellant court, in reversing the lower court, stated:

> "History is replete with the bigotry, intolerance, and dogmatism of religious sects, and the pages thereof are strewn with martyrs who died for their faith. The divergence in creeds, the evils growing from a union of church and

> state, and the conflicts for supremacy waged between the two were studied and considered by the colonial pioneers who established the independence of these United States. They profited by peoples whose experiences in government had failed, as well as by the achievements of those whose governments had been more successful, and to avoid the griefs and disasters arising from the bigotry and religious intolerance of the preceding ages, they provided in our fundamental laws, Amendment 1 of the Constitution, of the United States, that the 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'"

In the case of *In Re Laura Doyle*, (1884) 16 Mo. App. 159, involving custody of a minor child, the Court stated in point 3 of the syllabus: "In determining what the child's interests are, the court looks only to its temporal welfare, and disregards all question of religion as affecting its spiritual interests." The role of the court in relation to matters of religion is stated in the same case at page 166 as follows: "The state of which we are citizens and officers, does not regard herself as having any competency in spiritual matters."

The case of *Denton* v. *James*, 107 Kan. 729, 193 P. 307, 12 A.L.R. 1146, is one in which it was sought to change the custody of a child because the person having custody was a Roman Catholic. In refusing to recognize this fact as one proper for consideration, the Court quoted as follows from the case of *Watson* v. *Jones*, 13 Wall. 679, 20 L. ed. 666: "In this country the full and free right to entertain any religious belief, to practise any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma."

Plaintiff occupies the home in question, not only as a joint-owner thereof, but also by court order. She has a

property right therein. It is her home, in which, by court order, she is charged with the responsibility of rearing, directing, training, instructing and caring for the infant children whose custody has been committed solemnly to her care. The use she is making of the home in instructing the children in the religious belief which makes the strongest appeal to her conscience is a normal use of a home. That home is her "castle" in the sense that this Court has no constitutional right or authority to "cross the threshold" in order to restrain her in the free but orderly and lawful exercise of her religious freedom. *State* v. *Littleton,* 108 W. Va. 494, 151 S. E. 713, 714.

For the reasons stated, this Court holds that the provisions of the decree of the Domestic Relations Court of Cabell County which are designed to restrict plaintiff in the use of her home in matters pertaining to her religious faith is in violation of the letter and spirit of Article III, Section 15 of the Constitution of West Virginia, and, for that reason, such provisions of the decree are void and unenforceable.

We cannot say that the decretal provisions for the support of plaintiff and the minor children, aggregating the sum of $100, are unreasonable or inadequate. In this connection, we bear in mind the fact that the plaintiff is given the right to occupy the home and to use the contents thereof, and the fact that the decree requires the defendant to pay the monthly installments of $46.10 on the lien indebtedness covering the dwelling property. We are unable to say that the trial court abused its discretion in relation to the award of court costs and counsel fees. The award of counsel fees in the sum of $50.00 covered only the services in the hearing before the trial court upon the motion to modify the provisions of the court's former decree. Such hearings are normally brief and rather informal. The trial court was justified in the view that the testimony was unnecessarily prolonged and that the record thereof was unnecessarily burdened by testimony on behalf of plaintiff designed to explain and

justify the tenets, beliefs and religious practices of Jehovah's Witnesses. The court is not permitted to concern itself with the reasonableness, tenability or plausibility of such religious tenets, beliefs and practices. In matters relating to alimony, support of minor children, counsel fees and court costs, the trial chancellor enjoys a wide judicial discretion, and his judgment in relation to such matters will not be disturbed on appeal to this Court, unless it clearly appears that he has abused such discretion. *State ex rel. Milyanic* v. *Eddy,* 106 W. Va. 370, 145 S. E. 643; *Hale* v. *Hale,* 108 W. Va. 337, 150 S. E. 748; *Finnegan* v. *Finnegan,* 134 W. Va. 94, 58 S. E. 2d 594; *Witt* v. *Witt,* 141 W. Va. 43, 87 S. E. 2d 524.

The judgment of the Domestic Relations Court of Cabell County is reversed to the extent that its decree restricts the plaintiff in the use of her home for religious purposes, and in all other respects such judgment is affirmed.

*Reversed in part;*
*affirmed in part.*