No. 16-0298 - *Quicken Loans, Inc. v. Walters*

LOUGHRY, C.J., dissenting, joined by KETCHUM, J.:

**FILED**

**June 15, 2017**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

The majority's illogical and legally unsound opinion takes a perfectly straightforward statute and, despite declaring it to be unambiguous, badly misconstrues it, making a perfectly lawful banking transaction illegal. West Virginia Code § 31-17-8(m)(8) prohibits *only* the predatory practice of making loans which on their face appear to be adequately collateralized, but actually exceed the securing property's fair market value when aggregated with other loans. In no way does the statute prohibit making loans which exceed 100 percent "loan-to-value"; nevertheless, the majority now prohibits this otherwise lawful practice and compounds this error by awarding respondent Walters (the "respondent") with attorney's fees for prosecuting a claim that garnered her nothing. Because this Court is neither empowered to *sua sponte* create regulatory banking legislation nor sits as an arbiter of "moral" victories, I respectfully dissent.

## I. Inapplicability of West Virginia Code § 31-17-8(m)(8)

The respondent refinanced her existing mortgage with the petitioner, Quicken Loans, Inc. (the "petitioner") in the amount of $136,000.00 for the purpose of lowering her interest rate and monthly payment. Her property was apparently only worth $67,000.00 at the time of the loan, despite a licensed appraiser valuing the property at $152,000.00. The respondent filed a complaint against the petitioner, the appraiser, and the loan servicer. She

1

settled for $98,000.00 with the appraiser and loan servicer and proceeded to trial against the petitioner on her claims of an "illegal loan" prohibited by West Virginia Code § 31-17-8(m)(8) and fraud; she sought punitive damages and a determination that the statutory violation was "willful" for purposes of voiding the loan. A jury rejected all of the respondent's claims except for a single violation without malice of West Virginia Code § 31-17-8(m)(8). Prior to trial, the petitioner moved the circuit court for judgment as a matter of law on the respondent's claim for a violation of West Virginia Code § 31-17-8(m)(8), which the circuit court erroneously denied.

The majority concludes, as did the circuit court, that this statutory provision prohibits the making of a singular mortgage loan in an amount that exceeds the fair market value of the property. In fact, it does no such thing. West Virginia Code § 31-17-8(m)(8) provides in pertinent part:

> In making any primary or subordinate mortgage loan, no licensee may, and no primary or subordinate mortgage lending transaction may, contain terms which:
>
> (8)   Secure a primary or subordinate mortgage loan in a principal amount that, *when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans* secured by the same property, exceeds the fair market value of the property on the date that *the latest mortgage loan* is made.

2

(Emphasis added). Without necessity of interpretation or construction of the statute, even the most casual reader can ascertain that the statute forbids only making a loan (whether primary or subordinate) which "when added to the *aggregate* total . . . of *all other* . . . loans secured by the same property" exceeds the property's fair market value. (Emphasis added). This clear and simplistic language plainly proscribes making a loan that, *when aggregated with other loans*, exceeds the property's fair market value. The *sine qua non* of this prohibition is the existence of "other primary or subordinate mortgage loans" which aggregate, along with the subject loan, to exceed the property's fair market value. The necessity of the existence of other loans is further made clear by the operative date for the fair market valuation of the property–"the date that the *latest* mortgage loan is made." (Emphasis added).

The rationale behind the mortgage loan prohibition, as stated in the statute, rather than the one created by the majority, is not difficult to discern. Loans which on their face alone do not exceed the property's fair market value, but do so when added to other encumbrances, may deceptively lure a consumer into believing the property adequately collateralizes the individual loan. In reality, however, such a loan creates potential personal exposure for the consumer because the property has insufficient value to cover the aggregate combined total of the loans, which *aggregated* total may be unknown to or not easily ascertained by the consumer. It is this type of deceptive and predatory practice that the

3

statute seeks to preclude.  On the other hand, a singular primary mortgage loan, the value of which exceeds the property's fair market value, would be hard for even the most unsuspecting consumer to overlook.  More importantly, such a loan may quite purposefully exceed the property's value in order to provide additional funds for other purposes, such as paying off other unsecured debt.  *See McFarland v. Wells Fargo Bank, N. A.*,  810 F.3d 273, 281 (4th Cir. 2016) (noting that excess proceeds of under-collateralized loan provided McFarland "with money he needed to pay off approximately $40,000 of student and automobile debt, as he had hoped.").

The majority, despite declaring West Virginia Code § 31-17-8(m)(8) unambiguous, launches into a lengthy discussion of the rule of statutory *construction* regarding avoidance of absurd results and the Legislative intent behind the statutory scheme to reach its erroneous conclusion that a single, stand-alone loan that exceeds the property's fair market value is prohibited by this statute.[1]  Focusing exclusively on the use of the terms

---

[1]As stated within the precedent cited by the majority, ascertaining and giving effect to the intention of the Legislature is the primary rule of "statutory *construction*."  Syl. Pt. 1, *Sheena H. For Russell H. v. Amfire, LLC*, 235 W.Va. 132, 772 S.E.2d 317 (2015) (emphasis added).  Further, avoidance of absurdity in favor of reasonableness are methods of "*construction* of a statute[.]"  Syl. Pt. 3, *Id.* (emphasis added).  The majority apparently overlooks the threshold, fundamental principle that "[j]udicial interpretation of a statute is warranted only if the statute is ambiguous[.]"  Syl. Pt. 1, in part, *Ohio Cnty Com'n v. Manchin*, 171 W.Va. 552, 301 S.E.2d 183 (1983).  Having declared the statute unambiguous, it is unclear why the majority relies upon these canons of statutory construction–there is quite simply nothing to construe.  *See* Syl. Pt. 6, *Leggett v. EQT Production Co.*, __ W.Va. __, __ S.E.2d __, 2017 WL 2333083 (2017) ("'When a statute is clear and unambiguous and the

4

"primary or subordinate" mortgage, the majority, like the respondent, grossly oversimplifies the statute, rendering meaningless more than half of the remaining language in the statute. The majority apparently believes this reverse engineering is necessary to reach the immaterial conclusion that the statute "applies" to "primary" or "first" mortgages. Certainly, it does. Depending upon whether the subject loan is a primary or subordinate loan, the statute is potentially applicable.

However, it is the majority's lack of familiarity with lending practices which reveals the fallacy in its logic when it states that "by definition only subordinate mortgage loans are 'subject to the lien of one or more prior recorded mortgages or deeds of trust.'" In short, the majority apparently believes that the only time a "primary mortgage loan" could be effectuated is when no other loans already exist. Quite the contrary, loans which assume the first-lien priority status, *i.e.*, "primary" loans, are commonly entered into when other, "subordinate" loans exist.[2] Through use of a garden-variety subordination agreement, the refinance of a "primary mortgage" preserves the first lien status of the mortgage despite the

_____

legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.' Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).").

[2]The statutory definitions provide that the only difference in a primary and subordinate mortgage loan is that the "subordinate mortgage loan" is "subject to the lien of one or more prior recorded mortgages or deeds of trust." W.Va. Code § 31-17-1(m) and (o). "Primary mortgage loan" is *not* defined as a singular loan which exists to the exclusion of all other loans. Rather, it is simply a mortgage loan which occupies first-lien position.

5

existence of "prior recorded mortgages or deeds of trust."[3]  In this event, the statute could be violated if this "primary" loan was entered into where there are additional "subordinate" loans which, aggregated with the subject primary loan, exceed the property's fair market value as of the date of the "latest" mortgage loan.  The reason the statute prohibits such practice–regardless of whether the subject loan is a primary or subordinate loan–is to account for this very scenario, *i.e.*, the refinance of a primary loan, which will continue to occupy first-lien status.[4]  The prohibition against this practice as to primary loans does *not* mean that a singular, stand-alone primary mortgage that exceeds 100 percent loan-to-value violates the statute.

This is the same conclusion reached by Judge Goodwin in the Southern District of West Virginia–the only jurist to have previously addressed this precise issue.  In *Skibbe v. Accredited Home Lenders, Inc.*, No. 2:08-cv-01393, 2014 WL 2117088 *6 (May 21, 2014, S.D. W.Va.), Judge Goodwin similarly reasoned that "the plain language of the statute

_____

[3]"A mortgage subordination agreement is a document frequently used when there are two mortgages on a home, and the homeowner is looking to refinance the first mortgage. The mortgage subordination agreement specifies which mortgage takes precedence over the other."  http://www.mortgage101.com/article/what-is-mortgage-subordination-agreement (last visited June 12, 2017).

[4]Were the statute not to make such a provision for primary loans, a predatory lender could simply refinance the *first-lien* mortgage and obtain subordination of any other loans, thereby duping the debtor into encumbering his or her property for a greater *aggregate* amount than the property is worth–the precise practice prohibited by the statute.

requires the existence of other mortgage loans before it will apply." I can scarcely improve

upon Judge Goodwin's straightforward reading of the plain language of the statute:

> By its terms, the statute does not apply when a borrower takes out her first mortgage loan and the principal balance of that loan exceeds the fair market value of the property at the time the loan is made. This section applies when a borrower takes out an additional mortgage loan, and the principal balance of that loan, when *added* to the outstanding balance of *other existing loans*, "exceeds the fair market value of the property on the date that the latest mortgage loan is made."

*Id.* (Emphasis in original). This conclusion is entirely unaffected by the respondent's string

cite of cases, which purportedly conclude that "the statutory prohibition applies to both

primary and subordinate mortgage loans." These cases either *did* involve multiple loans (to

which the statute plainly applies) or failed altogether to address the issue presented herein:

the applicability of the statute to a singular loan that exceeds the property's fair market

value.[5] To state that the statute "applies" to primary or subordinate mortgage loans is to miss

the entire issue presented herein.

---

[5]*Fabian v. Home Loan Center, Inc.*, No. 5:14-cv-42, 2014 WL 1648289 (N.D. W.Va. Apr. 24, 2014), and *Robinson v. Quicken Loans, Inc.*, 988 F. Supp.2d 615 (S.D. W.Va. Dec. 24, 2013), both involved a primary mortgage and a secondary home equity line of credit. *O'Brien v. Quicken Loans, Inc.*, No. 2:12-cv-5138, 2013 WL 2319248 (S.D. W.Va. May 28, 2013), *Hixson v. HSBC Mortgage Services, Inc.*, No. 09-ap-42, 2011 WL 4625374 (Bankr. N.D. W.Va. Sept. 30, 2011), *Bishop v. Quicken Loans, Inc.*, No. 2:09-cv-1076, 2011 WL 1321360 (S.D. W.Va. Apr. 4, 2011), *Crove v. GreenPoint Mortg. Funding, Inc.*, 740 F. Supp.2d 788 (S.D. W.Va. Aug. 11, 2000), and *Quicken Loans, Inc., v. Brown*, 230 W.Va. 306, 737 S.E.2d 640 (2012), were all disposed of on pleading or evidentiary issues or did not otherwise address the issue presented in any fashion. All of these cases, except for *Hixson*, involved the respondent's counsel.

The majority's reading of West Virginia Code § 31-17-8(m)(8) requires one to completely disregard the primary operative language of the statute, *i.e.*, the aggregation language. In order to give significance to this language, the respondent flimsily suggests that when there is no other such loan(s) with which to aggregate, the "outstanding principal balance" added to the subject loan is simply zero. However, if the Legislature had intended to wholly proscribe loans which, alone *or* in the aggregate, exceed a property's fair market value, it certainly could have done so by simply writing the statute to prohibit a mortgage loan that either singly or "when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans, *if any,* secured by the same property, exceeds the fair market value . . . ." The Legislature simply did not so intend.[6] Nor did the Legislature see fit to expand the statute to include single, primary mortgage loans when the statute was amended in 2001, 2002, 2010, 2012, and 2016.

The foregoing leads to the core fallacy underlying the majority's conclusion: there is simply nothing illegal or unlawful about making a loan in excess of a property's fair

---

[6]In fact, before inclusion of these and other provisions into this Article, it was entitled "*Secondary* Mortgage Loans." *See* W.Va. Code Chapter 31, Article 17 (1996). In 2000, subsection (m)(8) was added to West Virginia Code § 31-17-8 and the statute was amended to govern mortgages, generally, removing references to "secondary" mortgage loans and altering the title to simply "Mortgage Loans." However, the particular portion of West Virginia Code § 31-17-8(m)(8) at issue herein has remained unaltered since its inclusion in 2000, and has always forbidden primary or subordinate mortgages *insofar as* such mortgages aggregated with other outstanding loans exceeds fair market value.

market value should a lender choose to accept such risk.[7]  There is no federal prohibition on

such a practice identified by the respondent and such loans create greater risk to the lender

than the consumer.  In *McFarland*, 810 F.3d at 278, faced with precisely the same scenario,

the Fourth Circuit explained:

> Whatever the pitfalls, receiving too much money from a bank is
> not what is generally meant by "overly harsh" treatment . . . . [I]t
> is not the borrower but the bank that typically is disadvantaged
> by an under-collateralized loan.  That is why borrowers may pay
> a premium for under- or non-collateralized loans, why it is
> common practice for banks, as many borrowers can attest, to
> ensure that their real estate loans are for significantly less than
> property value, and why a generous mortgage loan is usually
> cause for celebration and not a lawsuit.

*Id.* at 280 (citations omitted).  Further, as Judge Goodwin aptly reasoned in the underlying

District Court opinion concerning this scenario:

> The notion that [a consumer is] harmed by [a mortgage loan that
> exceeds the secured property's fair market value] is ridiculous.
> Consumers using credit cards to incur more charges than they
> can repay are not disadvantaged by their high credit limits.
> Students financing their education are not disadvantaged by
> their ability to obtain such financing. The plaintiff obviously
> owes a larger debt than he otherwise would if he accepted a
> smaller loan. But that is exactly how loans work, and there is
> nothing unfair about it.

*McFarland v. Wells Fargo Bank, N.A.*, 19 F. Supp. 3d 663, 670 (S.D. W.Va. 2014), *aff'd in*

*part, vacated in part*, 810 F.3d 273 (4th Cir. 2016).  In fact, the Fourth Circuit fully embraced

---

[7]This would be subject, of course, to any and all applicable state and federal lending guidelines in the making and consummation of the loan.  *See* 15 U.S.C.A. § 1601 *et seq*. (governing "Consumer Credit Cost Disclosures").

9

Judge Goodwin's cogent analysis that "[i]f anything . . . an undersecured mortgage disadvantages the lender, not the borrower" when affirming Judge Goodwin's conclusion that such a loan is not, on its terms alone, substantively unconscionable.[8]

The foregoing is utilized not necessarily as dispositive of the meaning of the statute at issue, but as an illustration that loans that exceed a property's fair market value are neither unheard of nor inherently suspect. In fact, under the federal "Home Affordable Refinance Program"[9] such loans are often written by lenders with no loan-to-value ratio ("LTV") requirements.[10] *See* http://harpprogram.org/faq.php ("There is no longer a

---

[8]Interestingly, despite being represented by the same counsel as the respondent herein–Mountain State Justice–and presenting ostensibly identical facts involving only a singular, under-collateralized loan, McFarland did not bring an action for violation of West Virginia Code § 31-17-8(m)(8). Rather, he only asserted claims for substantive unconscionability and unconscionable inducement; the Fourth Circuit allowed only the claim of unconscionable inducement to proceed. The respondent in the case at bar voluntarily dismissed her claim of unconscionable inducement.

[9]*See Marks v. Bank of Am., N.A.*, No. 03:10-CV08039PHXJAT, 2010 WL 2572988, at *5 (D. Ariz. June 22, 2010) ("On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110-343, 122 Stat. 3765 (codified 12 U.S.C.A.§ 5201 et seq.) ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. 12 U.S.C.A. § 5219. . . . The EESA authorized the Secretary of the Treasury, FHFA, Fannie Mae, and Freddie Mac to create the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program ["HARP"], and (2) the HAMP ["Home Affordable Modification Program"].").

[10]*See* http://harp.gov/About ("Introduced in March 2009, HARP enables borrowers with little or no equity to refinance into more affordable mortgages without new or additional mortgage insurance. HARP targets borrowers with loan-to-value (LTV) ratios equal to or

10

maximum LTV limit for borrower eligibility. If the borrower refinances under HARP® and their new loan has a fixed rate mortgage, there is no maximum LTV. If the borrower refinances under HARP® and their new loan is an adjustable rate mortgage, their LTV may not be over 105%."). While such loans are expressly exempted from the reach of West Virginia Code § 31-17-8(m)(8), their mere existence demonstrates that the practice now made unlawful by the majority is, if perhaps not commonplace, perfectly legitimate. As Judge Goodwin astutely noted, "[f]ollowing the plaintiff's logic, all unsecured loans are substantively unconscionable[.]" *McFarland*, 19 F. Supp. 3d at 670. Just as unsecured loans are not *per se* unconscionable, singular loans that exceed 100% loan-to-value are not unlawful. As such, there is simply no reason why the Legislature would have chosen to forbid under-secured loans in a statutory scheme designed to prohibit *predatory* lending practices. *See Herrod v. First Republic Mortg. Corp.*, 218 W.Va. 611, 618, 625 S.E.2d 373, 380 (2005) (describing W.Va. Code § 31-17-8(m) as part of West Virginia's "predatory lending law").

In short, the majority has ham-handedly rendered a perfectly lawful lending transaction "predatory" in nature and, therefore, "illegal." For those of us not immersed in the industry, it is difficult to predict the sweeping implications of the majority's uninformed

greater than 80 percent and who have limited delinquencies over the 12 months prior to refinancing.").

decision. What is clear, however, is that it is now incumbent upon the Legislature to rectify this "judicial legislation" and cure any economic implications created by the unwary majority, which was apparently bent on salvaging the respondent's self-proclaimed "victory" that was only marginally obtained in the first instance.

II.      *Erroneous Attorney's Fee Award*

The respondent's self-proclaimed "victory" leads me to the majority's second, equally inscrutable and erroneous conclusion: that the respondent somehow "prevailed" in the underlying litigation, making her entitled to a potential award of more than $150,000.00 in attorney's fees, despite securing not a single penny in judgment from the petitioner for its alleged statutory violation. As indicated above, the jury awarded the respondent $27,000.00 in damages for the petitioner's non-willful statutory violation. Having previously settled with the other co-defendants in the total amount of $98,000.00 ($65,500.00 in compensatory damages and $32,500.00 for attorney's fees), after offset, the respondent received nothing from the petitioner. This perceived "moral victory" is wholly insufficient to substantiate an award of attorney's fees. In rejecting the same argument, the United States Supreme Court stated:

> The only "relief" [plaintiff] received was the moral satisfaction
> of knowing that a [] court concluded that his rights had been
> violated. The same moral satisfaction presumably results from
> any favorable statement of law in an otherwise unfavorable
> opinion. . . . . [A] favorable judicial statement of law in the
> course of litigation . . . does not suffice to render him a

12

"prevailing party." Any other result strains both the statutory language and common sense.

*Hewitt v. Helms*, 482 U.S. 755, 762-63 (1987).

A.    *The respondent did not "prevail"*

The United States Supreme Court has further explained that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation *which achieves some of the benefit the parties sought in bringing suit.*" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citing *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1ˢᵗ Cir. 1978) (emphasis added)).    The respondent can identify absolutely no "benefit" the trial and jury verdict rendered.    Similarly, this Court has held that "[f]or a plaintiff to have "prevailed" at trial, . . . he must demonstrate that the litigation effected the material alteration of the legal relationship of the parties in a manner which the legislature sought to promote in the fee statute."    *Schartiger v. Land Use Corp.*, 187 W.Va. 612, 613, 420 S.E.2d 883, 884 (1991).    The respondent's "victory" of a mere finding of a single, non-willful statutory violation resulted in absolutely no alteration of the legal relationship of the parties: the petitioner paid the respondent nothing and the debt remained intact due to the finding of a non-willful violation.    More to the point, this Court has expressly stated:

> A party who needlessly pursues litigation after he has been offered a settlement that exceeds what the jury finally awards by an amount sufficient to have compensated the plaintiff for all his attorneys' fees and expenses at the time the offer was made is

13

not entitled to any attorneys' fees that accrued after the offer was made.

*Id.* at 616, 420 S.E.2d at 887. This is precisely what occurred in this case. As indicated in the petitioner's brief, months before trial it extended a settlement offer to the respondent, which she rejected. The respondent then "needlessly pursue[d] litigation" and gained nothing. *Id.*

The majority appears to be implicitly operating under a misapprehension that the pre-offset verdict is of some legal consequence in this analysis. Let me be clear: the offset in this matter was not levied as a "favor" to the petitioner, nor is it a mere technicality which creates the illusion that the respondent did not prevail. An offset for amounts already paid by jointly tortious defendants is legally required and serves to fix, by law, the amount which the respondent is legally entitled to recover from the petitioner. Indeed, "[d]efendants in a civil action against whom a verdict is rendered are entitled to have the verdict reduced by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties." Syl. Pt. 7, *Bd. of Educ. of McDowell Cty. v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 600, 390 S.E.2d 796, 799 (1990). In this case, the respondent is entitled to recover *nothing* by operation of law. Until the offset is applied, the judgment is neither fixed, nor final. *See Groves v. Compton*, 167 W.Va. 873, 880, 280 S.E.2d 708, 712 (1981) (stating that when jury is not apprised of prior settlement amount "the trial court

14

deducts the settlement figure from the award *before entering the judgment*") (emphasis added). Therefore, focus on the pre-offset verdict of $27,000.00 is pointless.

Accordingly, the final appealable judgment entered in this matter was *zero*.[11] The judgment is precisely the same as if the jury had found no violation or a violation, yet no damages. Other courts have had little difficulty in reaching the inescapable conclusion that somehow eludes the majority: that the trial and verdict must have benefitted the respondent in some manner for her to have "prevailed." *See Goodman v. Lozano*, 223 P.3d 77, 78 (Cal. 2010) (finding plaintiff "ordered to take nothing against the nonsettling defendants due to the settlement offset" was not prevailing party); *Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 7 (Tex. Ct. App. 2007) (holding that because "settlement credits and insurance payment exceeded the jury's damage award . . . [plaintiff] was not the prevailing party and was not entitled to recover its attorney's fees."); *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 806 (Tex. Ct. App. 1988) ("It is one thing to allow a party an award of attorney fees on a successful claim notwithstanding an opposing party's success on an offsetting claim. It is quite another to allow attorney fees on a claim which, although successful, was paid in full [through prior settlements] before trial."); *Stout v. State*, 803 P.2d 1352, 1354 (Wash. Ct. App. 1991) (holding "one who obtains a verdict for

---

[11]The circuit court granted the petitioner's motion to correct the verdict to reflect an offset of $65,500.00, leaving a verdict of zero.

15

an amount equal to or less than what is already in hand has not received an affirmative judgment and is not the prevailing party" for purposes of attorney's fee award).

In absence of damages–a necessary element of any cause of action–what has the respondent successfully accomplished? The respondent did not seek a mere declaration that the petitioner violated West Virginia Code § 31-17-8(m)(8). She proceeded to trial under the belief that her action against the petitioner would garner her a damages award in excess of those amounts she had already received; she was wrong. Under the respondent's argument, the only party who benefitted from that erroneous risk assessment is her attorney. Quite simply, West Virginia Code § 31-17-8 does not exist to generate fees for lawyers. Under the majority's decision, there is no disincentive for attorneys to encourage their clients to endure the rigors of trial since, at worst, their client recovers nothing, yet they still recover their fees. This transforms the statute into a mere fee-generating mechanism for attorneys.

B.    *Attorney's fees under West Virginia Code § 31-17-17 are not compensatory*

I further take extreme issue with the circular position that, since attorney's fees were recoverable under the statute, such fees therefore form part of the compensatory damages to which the respondent was entitled, thereby justifying an award of attorney fees. Boiled to its essence, the respondent argues that the statutory allowance for attorney's fees supports the notion that she "prevailed"; since she prevailed, she is thereby entitled her to

16

attorney's fees. Aside from being entirely circular, this argument contains a more obvious

fallacy: that she is necessarily "entitled" to attorney's fees under the statute.

As set forth in my dissent in *Quicken Loans, Inc. v. Brown*, 236 W.Va. 12, 777

S.E.2d 581 (2014) ("*Quicken II*"), attorney's fees and costs are not *per se* compensatory

damages, the type to which a claimant is entitled. Although the discussion in *Quicken II*

regarded recovery of attorney's fees under the West Virginia Consumer Credit and Protection

Act, the analysis is the same. Like the Consumer Credit and Protection Act, West Virginia

Code § 31-17-17(c) makes fees *permissible*, not mandatory: "Any residential mortgage loan

transaction in violation of this article shall be subject to an action . . . by the borrower *seeking*

damages, reasonable attorney's fees and costs[.]" While a borrower may "seek" attorney's

fees, there is no language whatsoever in the operative statute making an award of fees

mandatory under any circumstances. As I explained in *Quicken II*, "[l]ogic suggests that

recovery of [attorney's fees] would have been structured as mandatory if the Legislature had

intended attorney's fees and costs to be deemed compensatory in nature[.]" *Id.* at 46, 777

S.E.2d at 615 (Loughry, J., dissenting). Moreover, a separate delineation of attorney's fees

and costs, in addition to "damages," further suggests that such an award does not represent

part of the recovery needed to compensate a plaintiff. Finally, the type of predatory lending

behavior West Virginia Code § 31-17-8 seeks to preclude is clearly "bad behavior"; the

purpose for which attorney's fees are awarded for such behavior is to "punish[] and

17

discourage." *Boyd v. Goffoli*, 216 W.Va. 522, 569, 608 S.E.2d 169, 186 (2004). Thus, it makes little sense to argue that the *availability* of attorney's fees, if appropriate, constitutes some sort of compensatory element of the respondent's damages which itself is sufficient to *justify* an award of attorney's fees. I therefore find the majority's new syllabus point declaring these permissive fees to be compensatory wholly without support.

## C. *The circuit court's attorney's fee analysis was error*

Assuming, *arguendo*, that the respondent's "moral victory" against the petitioner made her the "prevailing" party for purposes of an attorney's fee award, it is clear that the circuit court erred in summarily awarding fees generated prosecuting the entire cause of action against all defendants and only allowing an offset of a nominal, non-representative figure for attorney's fees received in the prior settlements. It is well-established that "when a complainant sets forth distinct causes of action so that the facts supporting one are entirely different from the facts supporting another, and then fails to prevail on one or more such distinct causes of action . . . attorneys' fees for the unsuccessful causes of action should not be awarded." *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 83, 380 S.E.2d 238, 250 (1989). The figure presented by the respondent to the circuit court reflected fees generated in pursuit of the *entire* case against *all* defendants, as reflected in the circuit court's order. Further, the figure requested by the respondent plainly represented efforts expended in pursuing its *entire* case against the petitioner, including her fraud claim on which she did not prevail. Any fee

18

award should have consisted only of those fees and costs generated in pursuit of the respondent's singular "successful" claim against the petitioner: the nominal statutory violation.

The circuit court attempted to ameliorate the obvious inequity of the significant fee award by offsetting those amounts received from the settling co-defendants that were designated as "attorney's fees" within those settlements. However, the round figures which purportedly represented attorney's fees in the prior settlements–$25,000.00 and $7,500.00–signify literally nothing. There is no evidence those amounts represented actual fees incurred and attributable to the claims against those parties. As settlement figures, they reflected compromised amounts rather than a precise calculation of fees and costs payable by that particular party in settlement of a claim for attorney's fees. Moreover, the circuit court summarily designated certain amounts to pursuit of claims against the settling defendants and concluded that, since such amounts were less than the actual settlement amounts, the respondent was getting some added benefit from offsetting the attorney's fee settlement sums. Significantly, however, since the circuit court's order contains no itemization of these fees and costs, it evades this Court's review. Further, the fact that the circuit court found that time dedicated to pursuing the settling defendants was actually *less* than they paid in settlement for those fees fully demonstrates how arbitrary and unmeaningful the offset truly is.

The flaws in the circuit court's analysis of the attorney's fee award are patent. Rather than clumsily retrofitting the settlement amounts to the clearly over-inclusive fee submission by the respondent, the circuit court, on remand, should dredge out of the fee statements only those amounts reasonably attributable to prosecution of the singular statutory violation upon which the respondent received a favorable result. As indicated above, this is required by our caselaw. The circuit court should then itemize those entries in its order making appellate review of such award feasible. In absence of this methodology, the attorney's fee award is a wholly arbitrary and unreviewable, such that the award that should not stand.

## III. *Conclusion*

The majority's wholly misguided handling of this marginal verdict, both substantively and with respect to the fee award, is not only troubling, but has serious and far-reaching implications that will clearly require legislative correction. Further, the majority's decision virtually demands that this Court thoroughly revisit its attorney's fee award precedent, particularly that articulated in *Quicken Loans I and II,* rather than simply tossing in a new syllabus point on the issue while remanding for a badly mishandled fee award. Accordingly, I respectfully dissent.